729 P.2d 1035

**Myrtle HAZEN, Claimant-Appellant,**

v.

**The GENERAL STORE, Employer,**

and

**Transit Casualty Company, Surety, Defendants-Respondents.**

No. 15768.

Supreme Court of Idaho.

Oct. 21, 1986.

Rehearing Denied Dec. 12, 1986.

Richard S. Owen, Boise, for claimant-appellant.

John W. Barrett, of Moffatt, Thomas, Barrett & Blanton, Boise, for defendants-respondents.

1986 OPINION NO. 14, ISSUED JANUARY 31, 1986, IS WITHDRAWN, AND THIS OPINION IS SUBSTITUTED THEREFOR.

BAKES, Justice.

■ The basic tenet of appellate review is that on appeal the record is to be construed most favorably to the party which prevailed below.[1] *Higginson v. Westergard*, 100 Idaho 687, 689, 604 P.2d 51, 53 (1979); *Furness v. Park*, 98 Idaho 617, 570 P.2d 854 (1977); *Brizendine v. Nampa Meridian Irr. Dist.*, 97 Idaho 580, 585, 548 P.2d 80, 85 (1976).

Viewing the record most favorably to the respondent, which the foregoing cases have uniformly held that we must do, the record reflects the following. Appellant, who was 61 years old at the time, had been working several months for her employer as a gas station cashier. In early 1983, Hazen's em-

---

1. The dissenting opinion of Justice Huntley views the record most favorably to the appellant in arriving at his conclusions. For example, there was substantial evidence from several sources that, during the four month period after the grand opening in mid-May, the claimant did not assert that she had had an accident, nor did she assert that her back problems were work related. In discussions with her employer and with the chiropractor as late as the latter part of August, 1983, four months after the grand opening, claimant was still relating that her condition had come on gradually and that she had no idea of the cause of the pain. Nevertheless, the dissenting opinion states, in footnote 1, that "Hazen consistently maintained that the injury occurred during the grand-opening...."

ployer expanded operations by constructing a convenience store at the same location. Hazen's regular duties in the store included lifting cases of beer and pop and moving them when stocking the merchandise. Each of these cases weighed approximately 30–35 pounds. In addition, the convenience store had a fountain, and the cashier clerk, such as the claimant, was responsible for moving cylinders of pop.

The claimant's testimony indicated that during mid-May of 1983, shortly after the grand opening of the convenience store, Hazen began to notice that in the evenings after work she was tired and ached all over, and had a sharp pain in her right leg. The pain continued for several weeks after its initial onset, and during that time she had discussions with her supervisor about the pain she was experiencing. During those discussions she never attributed the tiredness and the pain in her leg and back to her work, or any accident occurring during her work. At that time Hazen and her supervisor believed that the type of shoes which Hazen was wearing in her work was causing the problem, and Hazen purchased a pair of shoes with arch supports. However, the new shoes did not alleviate the problem. Nevertheless, the pain and tiredness were not so severe that appellant's ability to perform her job duties was affected.

In August of 1983 the appellant went to see a chiropractor, Dr. George Squires, Jr. She told the chiropractor that she had no idea what the cause of the pain was. Based upon information supplied by Hazen, the chiropractor's health insurance claim form stated that Hazen's problems were not work-related, but rather had come on gradually over a long period of time.

In late August of 1983, the chiropractor referred claimant to a neurologist who performed a CAT scan and myelogram. Hazen was advised by the neurologist, Dr. Michael O'Brien, that she had a herniated disk and needed surgery. The surgery was performed on August 29, 1983. Up to that time, claimant had never asserted that her medical problem was work-related, or that it resulted from an accident which she had incurred during her employment.

There is nothing in the record to suggest that claimant ever filed a notice of injury or claim for compensation in writing with the Industrial Commission within sixty days, as required by I.C. § 72–701. However, on October 21, 1983, claimant, through her attorney, filed an application for hearing with the Industrial Commission. In the application for hearing, the claimant stated that the date of the accident and injury was between July 9th and July 16th, 1983. In December of 1983, an amended application for hearing was filed with the Industrial Commission. In this amended application for hearing, the claimant alleged that her accident and injury occurred between May 13th and May 23rd of 1983, claiming it resulted from lifting heavy crates and cases of pop. Claimant specifically pinpointed these dates, alleging that her condition resulted from lifting cases of pop during the convenience stores grand opening which was held during mid-May of 1983.

At the hearing before the Industrial Commission, depositions of three doctors, including the examining chiropractor and the neurologist, were submitted to the commission. The third deposition was of Dr. Ercil Bowman, Jr., an orthopedic surgeon, who testified that "there does not appear to be any specific incident which caused this lady to have a herniated disk which is documented by the record." It was his opinion, as found by the commission, "that the claimant had a gradual onset of disc disease from wear and tear or the ordinary activities of life." Dr. Bowman also testified that, "My opinion is that the activity in May did not lead to the surgery." He further testified that claimant's X–rays indicated that her back problems were most likely the result of the aging process.

The Industrial Commission apparently chose to believe the testimony of Dr. Bowman and found that claimant's herniated disk was not the result of an accident, but had come on gradually over a long period of time and, as Dr. Bowman testi-

fied, was the result of the aging process. That finding by the commission was based upon the expert testimony of Dr. Bowman. Dr. Bowman's testimony was corroborated in part by claimant's own testimony and the record in this case, which suggests that throughout the period from May of 1983, until after her surgery on August 29, 1983, the claimant at no time attributed her problem to her employment, or an accident which occurred during her employment. That corroborative evidence includes the testimony of her employment supervisor and the history taken by Dr. Squires, the chiropractor, and Dr. Bowman, the neurosurgeon.

Accordingly, construing the record most favorably to the respondent in this matter, as we must, there is more than sufficient substantial, competent evidence to sustain the finding of the Industrial Commission "that the claimant's herniated disk was not the result of an accident but rather occurred over a longer period of time" and, as Dr. Bowman testified, as "the result of the aging process."

■ Claimant argues, nevertheless, that the commission erred in Conclusion of Law No. 1 in its interpretation of our prior case of *Wynn v. J.R. Simplot Co.*, 105 Idaho 102, 666 P.2d 629 (1983). In Conclusion of Law No. 1, the commission held, relying on the *Wynn* case, that "the Supreme Court has retained the requirement that in order to constitute an accident the claimant must show that he suffered his injury at a particular time and at a particular place." What the Court in *Wynn* actually held was that the claimant in that case had actually shown, and the record was uncontroverted, that he had had an accident at a particular time and a particular place. Accordingly, to the extent that the commission may have stated in Conclusion of Law No. 1 that the *Wynn* case required a claimant to show that he had suffered his injury at a particular time and at a particular place, that was not an accurate statement of the law set out in the *Wynn* case.

Ordinarily, if we were of the view that that possible erroneous interpretation of the *Wynn* case affected the commission's finding as to whether or not an accident had occurred, we would remand the matter to the commission with directions to make new findings based upon the proper interpretation of the *Wynn* case. However, a careful reading of the commission's findings discloses that any misunderstanding by the commission that an accident must be identified as to a particular time and place, rather than "reasonably located as to time when and place where it occurred," did not materially affect the commission's findings in this matter. The commission's finding that the claimant's condition is the result of the aging process, and was not the result of her employment, is adequately supported both by the testimony of Dr. Bowman and by the fact that the claimant asserted that her problem was not work-related for four months after the time when she now says that she incurred the industrial accident. Therefore, whether or not the commission felt that an accident had to occur at a particular time, rather than merely be reasonably located as to time and place, does not change the effect of the commission's determination that claimant's problem came on gradually as the result of the aging process and the wear and tear from the ordinary activities of life, and not the result of her employment.

Accordingly, viewing the record most favorably to the respondent, it is apparent that the commission's determination that the claimant's condition was the result of the aging process, rather than her employment, was not adversely affected by any possible misunderstanding of a proper interpretation of the *Wynn* case. Accordingly, we affirm the order of the commission, for which there is substantial competent evidence in the record.

Affirmed. Costs to respondent.

DONALDSON, C.J., and SHEPARD, J., concur.

HUNTLEY, Justice, dissenting.

I respectfully dissent and would present a slightly different recitation of the facts than that noted by the majority.

Myrtle Hazen testified that on May 16th, 17th, and possibly the 18th of 1983, during a "grand-opening," she lifted between eighteen and twenty-four cases of pop weighing thirty to thirty-five pounds each and carried them thirty to thirty-five feet as part of her duties at the General Store where she was employed. These were the heaviest items she carried at any time during her employment. Her ordinary duties involved lifting canisters of pop and stocking the store's shelves.

Hazen began experiencing sharp pain in her right leg on May 17th or 18th, twelve to forty-eight hours after carrying the cases of pop. She also had pain in her lower back. She never had any problem with leg or back pain prior to May 17, 1983. After two to three weeks, the pain became severe. She first went to see a chiropractor, Dr. Squires, who recommended her to Dr. Michael O'Brien, whom she saw on August 25, 1983. Dr. O'Brien diagnosed a herniated disc in her back. He testified it probably resulted from her work, however, he could not identify any particular time at which the herniation occurred. He further testified it was not abnormal for the pain from a herniation to increase gradually, as it did. On August 29, 1983, Hazen underwent surgery for the herniated disc. On April 12, 1984, Dr. Ercil Bowman examined Hazen on behalf of the General Store. Dr. Bowman testified the rupture came on gradually and was not due to any particular incident, but rather to wear and tear. However, his opinion was not based on the fact that Hazen started getting sharp pains within about twenty-four hours after the heaviest lifting she ever did at the store. When he took this into account, he admitted the onset of pain was not inconsistent with a herniation at the time of the lifting.

In Hazen's application to the commission for a hearing, she claimed her injury occurred between July 9 and July 16, 1983, due to the lifting of crates of food for stocking the store's shelves. She later amended the application to say the injury occurred between May 13 and May 23, 1983,[1] as a result of lifting the cases of pop. Nevertheless, she told her employer in August of 1983 she had a back problem, but that it was not due to an injury on the job.

After the hearing upon Hazen's application for Worker's Compensation benefits the Industrial Commission held Hazen failed to prove she suffered an accident as defined by I.C. § 72–102(14)(b) (1983). The commission reasoned that this Court had, in *Wynn v. J.R. Simplot Company*, 105 Idaho 102, 666 P.2d 629 (1983), retained the requirement that an accident be "definitely" located as to time and place. The commission concluded Hazen could not recover because she failed to prove the injury causing mishap occurred at a particular time and place.

The majority opinion twice states that the commission found that the herniated disc was caused by the aging process—my search of the Findings and Conclusions reveals no such finding. The key finding which the referee did make was:

The Referee is persuaded by the bulk of the evidence whereby the Claimant testified she was not able to identify a specific incident and the various statements she told both the physicians and her supervisor at work that, in essence, the pain "came on gradually," that the Claimant's personal injury occurred over a substantial period of time.

The Referee finds that the Claimant's herniated disc was not the result of an accident but rather occurred over a longer period of time and "came on gradually."

Thus, it is apparent that the referee was mistaken of the belief that to qualify as an accident there must be an "instantane-

<hr />

1. Hazen consistently maintained that the injury occurred during the grand-opening and explains her having given her attorney the incorrect July date by the fact that she met with her attorney only a few hours after returning from the hospital where she had been advised that her husband was terminally ill.

ous" event. A reading of the questions and answers of the doctors indicates they were operating under the same misapprehension. It is to be regretted that the attorneys did not define "accident" in the terms of their questions with more precision—it is more regrettable that the commission did not have time to review the transcript more carefully to detect and correct this lack of precision.

In *Wynn*, the commission denied a claim for Worker's Compensation benefits on grounds the claimant failed to show a distinct mishap caused the injury. This Court reversed, finding the evidence established that the mishap occurred at a particular time and place entitling the claimant to relief under the Worker's Compensation Act. *Wynn*, 105 Idaho at 104, 666 P.2d at 631. The commission below interpreted *Wynn* as establishing the legal definition of "accident" under the Worker's Compensation Act. Hazen, on the other hand, asserts *Wynn's* determination that the injury occurred at a particular time and place was merely a finding of fact which fell well within the broad legal standard of I.C. § 72–102(14)(b) (1983), which requires only that the injury causing mishap be "reasonably" established as to time and place.

*Wynn* does not attempt to define the term "accident" for purposes of the Worker's Compensation Act. *Wynn's* facts and holding are consistent with the definition of accident in I.C. § 72–102(14)(b) (1983). No language in *Wynn* justifies the commission's interpretation of the case as altering that statutory definition.

The commission applied the same legal standard as that set forth in the Worker's Compensation Act (Act) from 1939 until 1971:

> "Accident," as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happening *suddenly* and connected with the industry in which it occurs, and which can be *definitely* located as to time when and place where it occurred, causing an injury, as defined in this law. I.C. § 72–201 (1939–70) (emphasis added).

In 1971, the legislature substituted the word "reasonably" for the word "definitely" and omitted the word "suddenly."

> "Accident" means an unexpected, undesigned and unlooked for mishap, or untoward event, connected with the industry in which it occurs, and which can be *reasonably* located as to time when and place where it occurred, causing an injury. I.C. § 72–102(14)(b) (1971–83) (emphasis added).

In substituting the word "reasonably" for the word "definitely" and omitting the word "suddenly," the legislature rejected the standard applied by the commission and adopted the standard urged upon us by Hazen. The change in statutory language demonstrates legislative recognition of medical reality. Bones may break "suddenly" and completely, giving immediate notice of injury, thereby allowing the accident to be "definitely located as to time and place." On the other hand, more flexible internal tissues and organs may be incrementally damaged, not suddenly, but over a period of time, such as hours, days, or in some cases, weeks. The time and place of the accident may not be definitely locatable because sufficient damage has to occur before symptoms are triggered warranting medical attention, such as substantial or continuing pain.

By way of illustration, a worker might be injured over the course of a few days. Symptoms might not arise for a few more days, and the need for medical attention might not become apparent for still another week or more. The injury causing event was not sudden and the lapse of time between the event and the need for medical attention may make it impossible to definitely locate the time and place of the event, due to the worker's failure of memory, for example. Nevertheless, proof of an "accident" is still possible if the time and place of the "untoward event" can be "reasonably located." I.C. § 72–102(14)(b). Proof of an "untoward event" depends on factors such as the seriousness and type of injury, presence of an unusual degree or

type of stress, and the degree of connection between the stress and the injury.

It is apparent the commission applied the pre–1971 legal standard. I would therefore reverse and remand for further proceedings consistent with this opinion.

BISTLINE, Justice, dissenting.

It appears that the January 1986 dissenting opinion of Bakes, J., capitalized upon by extremely able worker's compensation counsel representing the surety and its insured employer, has succeeded in turning one member of the Court about, and the surety now has a 3–2 decision wholly in its favor. For a number and variety of reasons, the earlier opinion for the Court was much to be preferred.[1] Which is not to say that Mrs. Hazen is entitled to compensation from the surety, but is to say that on the deplorable state of the record, Justice Huntley was 100 percent correct in the January opinion vacating the order which denied Mrs. Hazen any benefits. That opinion did not purport nor even tend to purport that Mrs. Hazen would or would not become eligible for compensation. As a matter of clearly discernible fact, that opinion was not overly elaborate (nor need it have been) in stating the nature of the controversy, but did succinctly state the final disposition by the Commission in this language:

> After the hearing upon Hazen's application for Worker's Compensation benefits the Industrial Commission held Hazen failed to prove she suffered an accident as defined by I.C. § 72–102(14)(b) (1983). The Commission reasoned that this Court had, in *Wynn v. J.R. Simplot Company*, 105 Idaho 102, 666 P.2d 629 (1983), retained the requirement an accident be "definitely" located as to time and place. The Commission concluded Hazen could not recover because she failed to prove the injury causing mishap occurred at a particular time and place.
>
> January 31, 1986 majority opinion, [Appendix A, 992, 729 P.2d p. 1055].

In actuality, however, this was not a compensation case over which the three, or any one of the three, commissioners presided. The case was assigned to a referee who saw and heard those witnesses who did testify at the hearing, and only read the deposition testimony of the three doctors which was separately taken and then transcribed. After the depositions were filed, the referee had the benefit of reading the same, and any notes which she might have taken at the hearing; she also had the benefit of briefs supplied by respective counsel. Thereupon, the referee wrote her decision which she would recommend that the Commission adopt as its own.

Our January 31, 1986 opinion commented very compassionately on her decision: "The Commission's findings restate the evidence rather than resolve factual issues and so are of little assistance on appeal." That was an understatement, and with Bakes, J., now commanding a majority, the truth must out. These so-called findings do not approach the quality of being called such. To say that they are findings of the Commission is perhaps to do an injustice to the commissioners, but on the other hand, mayhap not an unjust injustice—because the Commission did not reject them, as it should have. My impression was that our January, 1986 opinion was affording the Commission itself the opportunity to review the record, take any clarifying testimony, and make its own findings of fact and conclusions of law. Not only is the claimant entitled to at least that much, but all parties are. Frankly, it defies my imagination that any attorney who is regularly handling worker's compensation cases would eschew the opportunity to have the Commission itself be the determiner of contested cases—recognizing, of course, that an attorney in the representation of a client who has won a doubtful decision as here is not well positioned to do other than make the attempt in behalf of his client to keep that decision intact.

---

1. Copies of the initial majority and dissenting opinions are attached hereto and for continuity should be first referred to in perusing today's opinion for the Court. Appendix A.

**978**

In addition to agreeing with the concerns of the Court's January 1986 opinion, there was good reason to believe that a greatly overworked and underpaid Commission simply put far too much faith in the referee's written decision. As has generally been so, the referee submitted that decision to the Commission without first, or at least contemporaneously, submitting it to counsel involved—thereby at the least affording them the opportunity to request of the referee or the Commission itself a time and place to voice any objections to the referee's work product before it was given the Commission's stamp of approval.

So that the reader may thoroughly comprehend the inadequacy of the referee's written decision, a copy of the same is attached as Appendix C, and attention to it is directed now in order that the dissatisfaction therewith set out in our January opinion may be better understood, but without unnecessary elaboration.

In a complete mish-mash the referee intertwined her findings and conclusions. Not only that, she attempted to fit them into a pattern compatible with and comparable to *Wynn v. Simplot*, 105 Idaho 102, 666 P.2d 629 (1983). In "Finding" No. VIII, R., p. 28, she recounts claimant's evidence that claimant was not able to identify *a specific incident* and claimant's statement to the doctors and her work supervisor that *the pain* "came on gradually." The referee says of this evidence that she is persuaded therefrom that the "injury occurred over a substantial period of time" —which is classifiable as a finding, but, nevertheless it is repeated within the final sentence of No. VIII in this manner:

> The Referee finds that the Claimant's herniated disc was not the result of an accident but rather occurred over a longer period of time and 'came on gradually'.

At that point, switching over to what she calls her Conclusions of Law, the referee, having just declared as a finding that claimant's herniated disc was not the result of an accident, declares that she must first resolve whether claimant's evidence demonstrated that she had suffered an accident, as within the meaning of the Workmens' Compensation Act. She states that the argument advanced by claimant based on *Wynn* is that the occurrence was reasonably located as to time and place, caused by a misreading the *Wynn* case as standing for the erroneous proposition that a claimant, to establish an accident, "must show that he suffered his injury at a particular time and at a particular place...." From that stance the referee concluded "that the claimant in this case has failed ... to establish that her herniated disc was caused by an accident...." R., p. 30.

On that state of the record a reversal was absolutely mandated. Nothing could have been more clear; the referee in her gross misinterpretation of *Wynn* (which is agreed upon by all members of the Court) applied that misinterpretation to Mrs. Hazen's case, and declared, whether a finding of fact, a conclusion of law, or an ultimate finding as to the underlying primary issue, that Mrs. Hazen had not suffered an accident. It is disheartening to see such a misunderstanding of the clearly understandable language in *Wynn* being used to perpetrate a great injustice on an employee who beyond any question of a doubt suffered a very serious injury to her back, with no one able to point to any cause of that injury other than Mrs. Hazen's rather extreme physical exertion, for a person of her sex and age, at the grand opening. The referee's recitation of the evidence, found in her findings of fact, provides more than adequate proof of what appears to have been the cause of the herniated disc:

> The Claimant testified that during the store's grand opening, her duties included pulling cases of coke out of a delivery van and moving them to the front of the station and stacking them so they would be available for the customers. She testified that each case weighed approximately thirty to thirty-five pounds and that she moved approximately eighteen to twenty-four of the cases on Monday, May 16, 1983. The Claimant testified that she had not performed any unusual work on the 14th of May, but that on the

mornings of May 16 and 17 she had to move the cases of pop. She also testified that she believed that she had moved cases of pop on Wednesday, May 18, 1983, but the Defendants testified that the van was moved from the premises of the general store on the afternoon of May 16, 1983.

The Claimant testified that in the evenings after performing her work in mid-May, 1983, she was tired and ached all over and had a sharp pain in her right leg. She also had a sharp pain in her hip and down the small of her back. At the hearing, the Claimant identified the onset of pain as being Tuesday, May 17 or Wednesday, May 18, 1983.

The Claimant's pain subsequently changed to a constant aching pain and approximately three to four weeks after the initial onset of pain, the Claimant had a discussion with her supervisor about the pain she was experiencing in her legs. The two women discussed the problem on several occasions, and they thought the problem might be due to inadequate support for the Claimant's legs. The Claimant and her supervisor thought that perhaps the type of shoes which the Claimant was wearing was the problem, and the Claimant purchased a pair of shoes with an arch support. She hoped that the arch support in the new shoes would alleviate the pain she was experiencing. The new shoes did not help.

....

### III.

In the first part of August, 1983, the Claimant went to Dr. Squires, a chiropractor, because of the severity of the pain she was experiencing.

The Claimant told Dr. Squires that she had no idea of the cause of the pain and that it had come on gradually. The only heavy lifting she had done was of the cylinders and the cases of beer and coke.

The Claimant saw the chiropractor from August 2, 1983 to August 12, 1983 when he referred her to Dr. O'Brien.

### IV.

The Claimant saw Dr. O'Brien, a neurologist, on August 25, 1983. He scheduled her for a CAT scan and myelogram on August 26, 1983.

The Claimant told her employer that she would not be in to work on August 26, 1983, that she had a herniated disc and needed surgery. August 24, 1983 was the claimant's last day of work at the general store. The Claimant underwent surgery on August 29, 1983.

R., pp. 24–26.

In keeping with her own distorted view of the *Wynn* opinion, the referee made certain other findings (or statements) which, while corroborative of the grand opening activity being the cause of the herniated disc which would later be detected by specialists, showed the referee's flavoring because of her misconceptions of the *Wynn* rationale. For instance:

Dr. Squires testified that he and the claimant discussed the Claimant's occupational role at the store, *but they did not discuss a specific date or a specific cause* of the Claimant's injury. See Deposition of Dr. Squires, Page 12, Line 13 to 23.

Dr. Squires assumed that the Claimant's problem was "occupationally related", but he did not identify any *specific incident*. See Deposition of Dr. Squires, Page 17, Line 4 to 18, Page 18, Line 1 to 16.

### VI.

The history the Claimant gave Dr. O'Brien on August 25, 1983 was that she had had a problem with serious back pain for approximately two months prior to seeing him. The Claimant's history was that the back pain had moved into her back for approximately a month before that time. See Deposition of Dr. O'Brien, Page 6, Line 15 to 24.

Dr. O'Brien's opinion was that the Claimant's injury was caused by her work; i.e., that the Claimant's disc herni-

ation was caused by the heavy lifting she did at work.

Dr. O'Brien indicated that he had been told that the Claimant had to lift heavy cylinders for the dispensing machines for the pop and the cylinders were quite heavy and apparently the Claimant told Dr. O'Brien that was her problem with the lifting. See Deposition of Dr. O'Brien, Page 32, Line 7 to 19.

*Dr. O'Brien was unable to pinpoint the time of injury,* but his view was that there was a general progression of the problem to where the Claimant needed surgery. See Disposition of Dr. O'Brien, Page 36, Line 24 to Page 37, Line 9.

R., pp. 26–27 (emphasis added).

It is, or should be, readily apparent that there was no other cause to which the surety could point as being attributable to the herniated disc—an injury if ever there was one—other than the extraordinarily heavy lifting *and stacking* which occurred at the grand opening. Clearly, however, the time and place was "reasonably located" as required by law. Clearly, the referee would not find an accident without claimant being able to provide evidence of a *specific* occurrence at a *specific* time.

Clearly, too, as anyone knows, an uninformed person experiencing leg pains is naturally going to attribute those pains to a problem in the legs, not the back. Any such person, uninformed in the field, will only learn later that leg pains are most often caused by back problems. There is nothing at all unusual in the history of Mrs. Hazen: the ultimate conclusion of all the experts, involving well-recognized medical testing by doctors experienced in the field, was that a disc had ruptured and that injury brought on the onset of pain in the legs, with ever-increasing severity.

**2.** Dr. Bowman's written report to the surety volunteered a different concept. There he said as to Mrs. Hazen's spine:

> X-ray examination reveals that she has narrowing of the facet joints at L5,S1 and less so at L4,5. Generally speaking there is *a minimal amount of arthritis* considering age and past history.

> Deposition of Bowman, Ex. 1, p. 2 (emphasis added).

What is painfully clear is that the statement of Bakes, J., in the majority opinion, at 973, 729 P.2d at 1036, that the "Commission found that claimant's herniated disc.... as the result of the aging process," was selectively isolated out of context. The language closest to that misstatement is supposedly found in the referee's restating of what she derived from reading Dr. Bowman's deposition. Quoting directly the language of the referee:

> He indicated that his opinion was that the Claimant had a gradual *onset of disc disease* from wear and tear of the ordinary activities of life.

> R., p. 28.

If Dr. Bowman ever mentioned "disc *disease* " in his deposition, I am remiss in my reading abilities.[2] The closest he got to using any language as to the cause of Mrs. Hazen's herniated disc was in cross-examination testimony given at his deposition:

Q. Doctor, what sort of lifting would you consider most likely to bring on a disc herniation such as Mrs. Hazen had, just in general terms?

A. Wait a minute, now. If you are asking me to say that lifting brought on Mrs. Hazen's disc herniation, that I can't—I won't state.

Q. Okay, Doctor.

MR. BARRETT: Are you just asking him generally for people?

MR. OWEN: Just generally.

WITNESS: Generally, what will bring on a disc herniation? Is this the question?

Q. (BY MR. OWEN) Yes, Doctor.

A. If that's the question, then more generally speaking if it's the extremely heavy amount, picking it up from the

Accepting that arthritis is a disease, Dr. Bowman made it quite explicit that for this woman, at her age, the amount of arthritis was the "smallest in amount or degree; least possible." This I find as the definition of "minimal" in the closest dictionary at hand, *The American Heritage Dictionary of the English Language,* New College Edition.

floor, twist, turn, snap, jerk, having to do it in a hurry rather than the pacing type lifting would be. The other lifting we have already spoken to where it's the heavy weight where you suddenly get it all by yourself.

Q. I see. Doctor, if we believe Mrs. Hazen and the history that she has given do you have any opinion as to what could have caused her disc herniation?

A. I have to go back to the history she gives me, you know, right, if I am to have a valid opinion, and the history I get is that somebody who has a gradual onset which goes with the aging process, goes with the activities of daily living, work, non-work, occupational, non-occupational, and with the history I have obtained *this, to me, is a—is a logical conclusion.*

Deposition of Bowman, pp. 30–31 (emphasis added).

The best which can be made of that assemblage of disconnected phrases in the doctor's last answer above is that the doctor was so concerned with stating factors that might be taken into consideration that he did not provide a complete sentence. The doctor simply did not answer the specific question put to him. That answer does not justify the majority in saying that sufficient competent evidence sustains the finding that the claimant's condition was "the result of the aging process."[3] Supposing, arguendo, that the response did intimate what his answer might have been, it contradicts the statement in his letter where he said her aging and (work) history had produced *minimal* arthritis.

But, that which is not debatable is that Justice Bakes is not on safe ground in advancing the theory that the referee's misconception of the *Wynn* case, *i.e.,* the requirement of a particular time and place, is wholly independent of her conclusion, fact, or whatever, that there was no proof of an accident. Never before has it been so facially self-evident that a fact, conclusion, or hybrid of the two, has been so tightly interwoven with a misconception of law as is here self-evident.

## II.

Both the referee and Justice Bakes have ignored the very important fact that the referee, for whatever reason, opted to be persuaded by the equivocal and self-contradicting statements (letter v. testimony) of Dr. Bowman rather than the doctors who actually worked with this woman, and tried to help her, and did. As stated earlier, the referee made no mention that Dr. Bowman was *not* a treating physician.[4] But worse, where the referee knows that chances are good that the Commission will read her proposed decision and adopt it if it reads well, by her failure to do so she leaves the Commission, or anyone for that matter, without the knowledge that he was not a treating physician. Just as an experiment, I have paused to read again that which Justice Bakes has written. From it, if I knew nothing else, I would gather that there are two Dr. Bowmans, one of whom corroborated the other, and one of whom, the neurosurgeon, did the surgery for Mrs. Hazen.

Generally speaking, in most, if not nearly all, compensation cases, the treating physician is the favored witness—not the non-treating medical expert who is after the fact called in to give an impairment rating. That is nothing but common sense.

On cross-examination, Dr. Bowman, on being asked if he had other findings which precluded him from assigning her herniat-

---

3. Bakes, J., writes also that which opens his defense of the referee's handiwork with the statement that a basic tenet of appellate review is that on appeal the record is to be construed favorably to the party who prevailed. The cases he cites do not so say. What is said is that on challenges to findings, the evidence will be so reviewed.

4. "In fact, we would agree with Poss and the ITLA that in many cases the commission should give greater weight to the testimony of the employee's treating physician since he or she would have a much better opportunity to become acquainted with the claimant and the nature of the claimant's problem." *Poss v. Meeker Machine Shop,* 109 Idaho 920, 925, 712 P.2d 621, 626 (1985), per Donaldson, C.J.

ed disc to a specific incident, explained instead his late arrival on the scene status:

A. Well, no, because I have seen this lady after the fact. You know, I am seeing this lady after the fact. I can't go back and—

Q. I see. So your conclusion in that regard is based totally on—

A. Is a historical—

Q. Historical—

A. Right, has to be.

Q. And I guess if a person comes in and said she had two days of heavy work and noticed pain some two days later that wouldn't be inconsistent with a person who had a specific incident of injury; is that correct?

A. That would not be inconsistent, though I have to comment also that the patient who has a significant lifting injury and has significant disc problems doesn't wait two months before they—or two months and a half before they seek medical attention for it, either.

Q. Okay.

Q. Dr. Bowman, does the fact that Mrs. Hazen noticed the pain some one or two days after this heavy lifting change your opinion any, if that is, in fact, true.

MR. BARRET: Pain in the what? The back?

MR. OWEN: Pain in the lower back and the right leg.

MR. BARRETT: I am going to object simply because there is no evidence in the record to substantiate those facts. You may answer, Doctor, if you are able to.

WITNESS: Now, restate your question.

Q. (BY MR. OWEN) Let me make it more clear, Doctor. If it is, in fact, true that Mrs. Hazen did this extensive lifting on Monday and Tuesday of one week and then had pain that she noticed on a Thursday going down her leg, would that change your opinion that her lifting activities in May did not lead to her surgery?

Q. Now, are we talking about radiating pain down her leg or what?

A. This is the shooting sciatic type pain that goes down her leg.

A. All right. *If Mrs. Hazen was two days post heavy lifting, developed acute sciatic pain, then I think we would have to go back and evaluate the lifting activities as a cause, yes.*

Deposition of Bowman, pp. 27–29.

What is even more bothersome is not just the referee's failure to both observe *and consider* Dr. Bowman's nontreating status, or disclose it in her decision handed to the Commission, but worse yet, her presentation of Dr. Bowman's conclusions without deigning to mention that his conclusions as to what injured Mrs. Hazen's vertebrae were based entirely on nothing but a hypothetical question propounded to him by the surety.

## HYPOTHETICAL QUESTION

Q. And Doctor, as to Dr. O'Brien, she had seen him following this and at that time indicated to him that she could give no specific cause of the complaints and indicated no history of any injury as such.

Now Doctor, based upon the history as given to you by the patient and assuming the history as I have indicated in—through these other sources, Doctor, do you have an opinion based upon a medical probability—and by that I mean simply more likely than not—as to the cause of this lady's condition which required surgery and the condition which I understand was a herniated—central herniated disc, I believe, that the—at the level of L4–L5.

MR. OWEN: Just for the record, I will object to the form. I don't believe the doctor has testified as to what history was given him.

MR. BARRETT: It's contained in Exhibit Number 1.[5]

MR. OWEN: Okay.

5. This exhibit is Dr. Bowman's report to Mr. Barrett and is attached as Appendix B.

MR. BARRETT: That's admitted in evidence.

MR. OWEN: Okay.

WITNESS: Would you rephrase the question?

Q. (BY MR. BARRETT) Based upon the history given to you by the Claimant and the information that I have given you in prior questions, do you have an opinion based upon a medical probability as to the cause of the Claimant's condition that required surgery, that is the herniated—central herniated disc at the level of L4–L5?

A. I have a qualified opinion, sir.

Q. You may state it, Doctor.

A. The—There does not appear to be any specific incident which caused this lady to have her herniated disc which is documented by the record.

Q. Now Doctor, I want to give you some additional information and for your information in this case, the Claimant has testified before the Industrial Commission and have—as have other witnesses, including her supervisors as well as employees—and when I refer to other employees it's the lady who was a co-employee but, as I understand it, also was a—in a supervisory position.

Doctor, the Claimant has worked for several years for the employer and initially this involved a self-service type gas station with small articles of items that persons could buy, but basically one of these self-service, and this involved an employee, including the Claimant, that day in and day out would take money for people who had purchased gas, they would move cases of oil products, they would move cases of pop from day in and day out to—in conjunction with this business.

Then in early 1982 some remodeling took place where they extended the business where she worked. In the middle of May they had what was termed as a grand opening and this consisted of three days and the records indicate that the Claimant worked—for example, the grand opening was, I believe, Friday,

Saturday and Sunday, whatever the days would have been, and she worked on the middle day and then again on the morning following, like on the Monday morning.

During the course of this work and prior thereto involved stocking shelves in addition to lifting cases of pop from a truck outside. Prior to that there had been—These were 12 quarts to a case.

Prior to that she had been used to moving cases of pop, 24 case—you know, the regular size cans of pop in a case—and then, of course, cases of oil which would be required even before the grand opening.

And she testified that during the course of doing this work she did not experience any undue pain. She testified that during the summer months that she was experiencing symptoms in her lower extremities, that she and her manager had discussed this in the first part of July and toward the end of June of '83 thinking it was the Claimant's—that she was wearing the wrong type of shoes and she changed types of shoes.

That in the middle of July she talked to another manager who noticed that she was—appeared to be limping and asked if she had injured herself and she stated no, she hadn't hurt herself, that she was tired and her legs were bothering her. Then she saw Dr. Squire on August the 2nd as I have related with the history given. Doctor, that—

A. Pardon me. What's the time interval between the—

Q. Grand opening?

A. Yes.

Q. That was in the middle of May of the same year.

A. So we are looking at two and a half months?

Q. Yes. Okay. Now, Doctor, adding that information to the history given to you by the Claimant and the results of your examination and the records to which you have reviewed of Dr. O'Brien and Dr. Cindrich relative to the diagnosis and results of surgery, do you have an

opinion based upon a medical probability—and by that I mean more likely than not—as to whether, given that history, *the activity prescribed by the Claimant during the middle of May was the cause of the condition found at surgery?*

A. Yes, I do.

Q. And what is that opinion, Doctor?

A. My opinion is that the activity in May did not lead to the surgery.

Q. And what's the basis of that opinion, Doctor?

A. The basis of the opinion is that, on a greater probability than not, something that leads to a herniated disc protrusion on an acute basis, which is what we have to postulate, if this, in fact, is related to the middle of May activity, causes pain, causes pain on the—at *that* time, as opposed to the gradual onset disc which comes on from wear, tear, what have you, and all the other activities that we go through in our life, occupational or non-occupational.

END OF HYPOTHETICAL QUESTION

Tr., pp. 10–15 (emphasis added).

Significantly, the hypothetical question stated, at p. 13 that "she did not experience any undue pain" at work, but contrary to that, that "she was experiencing [pain] symptoms in her lower extremities." This was discussed with the manager, attributed to footwear, and her type of work shoes was changed.

On cross-examination, there was some clarification of the hypothesis of the hypothetical question:

Q. I see. Okay. Okay, Doctor, for—of course, I don't mean to contradict what Mr. Barrett has told you, he has told you correctly about most of the facts. I just would like to make my—or let you know my understanding of how the testimony came down at the hearing or what Mrs. Hazen testified to and as I recall, Mr. Barrett, I am sure you—if you want to correct I'd be more than happy to stand corrected.

But she testified that the grand opening started on a Friday and she was off work on a Saturday and a Sunday. She came back in to work on a Monday and Tuesday and it was at this time that she moved these heavy—the cases of quart bottles and I think you understand, Doctor, these are the glass bottles in the heavy wooden cases and she had to move upwards of two dozen of these every morning.

And it was on Thursday—After the moving the bottles Monday and Tuesday, it was Thursday that she first felt the pain that went down her leg and, of course, she didn't know what it was at that time but her daughter noticed that she was limping and it felt like there was a pebble in her shoe or something that caused a shooting pain. Would that be inconsistent with the specific incident that happened that Monday or Tuesday, Doctor?

MR. BARRETT: I am going to object only on the ground that I believe that it does not contain the full history. She further testified that she—it was not simply in the right leg, that her legs bothered her and that she continued working and she denied that her symptomology were any greater during any various types of activities following that, and I would simply object on the ground that the information given the doctor is incomplete.

MR. OWEN: I am sure.

Deposition of Bowman, pp. 21–22.

And eventually, a different opinion, tempered by a volunteered statement showing the doctor's knowledge of the law:

Q. (BY MR. OWEN) Doctor, you can see we both have our independent recollections of what the testimony was but I do think the testimony is clear that she did first notice the pain only two days after these heavy lifting periods, and the question, again, would you say that is unusual or—

A. May I rephrase your question into an answer as I understand what you are asking me and so *I can answer it better*

*so there will be no mistake on the record?*

Q. Absolutely, Doctor.

A. If this lady was moving heavy boxes of whatever activity she was doing and if she developed symptoms within two days and if symptomology was related, as far as the pain shooting into the legs to ongoing activity, *then it would be reasonable to assume that the afore- mentioned activity did it,* but I have to emphasize the fact that symptoms have to be work-related—....

*Id.* at 23 (emphasis added).

And then a quick recantation as to the law he had just expounded:

or I shouldn't say work-related because I don't—activity related as far as the—as this type of thing is concerned.

*Id.* at 23.

It was on this opinion testimony, given in answers to hypothetical questions, the second one including a fact not included in the first, that the referee would point to the nontreating physician's "viewpoint that the Claimant's activities in the middle of May, 1983, were not the cause of the Claimant's injury which resulted in her undergoing surgery in August, 1983." The referee either overlooked or chose to conveniently ignore Dr. Bowman's different opinion when the hypothetical included Mrs. Hazen's unrefuted and corroborated testimony of leg pain shortly after the extra-heavy lifting episode.

As stated, and restated, nowhere in the written decision of the referee is there any indication that she was aware that Dr. Bowman was *not* a treating or consulting physician, or that he had no contact with Mrs. Hazen until long after she had had back surgery. Dr. Bowman was retained by the surety to examine Mrs. Hazen, which he did on April 2, 1984, 216 days post-surgery. Dr. Bowman reported back to the surety's attorney after his examination. That report stated that Mrs. Hazen, then age 62 years, had "a minimal amount of arthritis considering her age and past history." He declared that "her condition is stable . . . ," and accordingly rated her as

to physical impairment at ten percent (10%) of whole body. She was apparently subjected to questioning by Dr. Bowman as to her then present complaints interposed with questions as to her complaints prior to an unspecified date which eventually led to the surgery—in which he was not at all involved. He reports her telling him, *presently as of April 2, 1984,* that she could not lift without experiencing back pain, lumbo sacral, and that surgery "got rid of all my leg pain," stating also that the leg pain, obviously pre-surgery, was initially more severe in the right leg than in the left leg. His report added his observation that Mrs. Hazen apparently feels her problems came on at a time which would have been when the grand opening of the gas station transformed it into a convenience store.

Not apropros his apparent instructions to rate Mrs. Hazen, he interjected this comment in his written report:

If we accept the history as given here in the office that this lady has had no prior back problems until, as it was given,— last spring—*we have to conclude that she did not have a specific single incident.* This was then a gradual onset thing perhaps secondary to repeated lifting and moving cases of food and beverage in a convenience store or some other unknown event.

Ex. No. 1, Bowman Deposition, p. 2. The doctor was either inadvertent in his choice of words, or was looking ahead to the day when he might testify and hypothesize an opinion as to the cause of the herniated disc. His report opened with the sentence that he saw Mrs. Hazen "because of back surgery performed on 29 August 1983." Having been neither a treating or consulting physician prior to the surgery, and not having been retained by Mrs. Hazen, but by the surety to evaluate her impairment, it is not understood why he wanted any history from her; her history of the occurrence would not seem to have been necessary for a post-operative impairment rating. Such history as he recounted in his report was in all probability casual conversation. Early in the report, the fourth

sentence to be exact, the doctor states: "The history obtained, as far as this occurrence, is that she had a gradual onset of pain at work without any specific date of injury." That is past history, and it made no reference to the pain being "back" pain. The doctor then goes into the present tense, and writes: "She states that pain occurs on lifting. That the pain is lumbo sacral...." The doctor then immediately lapses into the past history and indentifies the unspecified "onset of pain" as specifically being in "her right leg initially ... worse than the left."

Just by a reasonable expenditure of time, then, it is seen that the doctor was not told by Mrs. Hazen that she had back problems in the spring of 1983. She had leg pain in both legs—which was consistent with all the testimony—and she only learned later on examination by Drs. O'Brien and Cindrich that it was her *back*—not anything wrong in her legs—which was causing that pain.

Ordinarily what would come out of Dr. Bowman's examination would be his impairment evaluation. What was included, however, was the statement "that she did not have a *specific single incident*" of any *back* problem until the spring of 1983. That the doctor would use this language is interesting in that it assuredly indicates his active interest in the law of worker's compensation, and his having been made aware of this Court's *Wynn* decision which issued in July of 1983; hence, the *specific single incident* language of the doctor's report to the surety.

The *ratio decidendi* inherent in the referee's decision is that the *Wynn* case requires of a claimant that "in order to constitute an accident the claimant must show that he suffered his injury at a particular time and at a particular place." Having established that erroneous predicate, the referee declared "that the Claimant has failed to establish that her herniated disc was caused by an accident within the mean-

ing of the Idaho Worker's Compensation Law." Appendix C, p. 998, 729 P.2d p. 1061.[6]

In the *Wynn* case, Justice Shepard writing for a majority of four simply had noted that it was not necessary "to engage in a semantic distinction analysis of whether an injury which results from trauma falls within the category of occupational disease as distinguished from the category of industrial accident or neither ..." because "It is enough to note that claimant here as indicated by the medical evidence, suffered his injury at a particular time, at a particular place, while engaged in his normal and ordinary work for his employer." *Wynn, supra,* 105 Idaho at 104, 666 P.2d at 631. The dissenting opinion of Bakes, J., in *Wynn* serves the purpose of illustrating the surety's contention that repetitive trauma to Wynn's spine, and not accident, was the cause of his herniated disc, which contention the Justice supported by inserting the Commission's Finding of Fact No. IX:

"It was the opinion of Dr. Schossberger, that the claimant's cervical spine showed evidence of pre-existing degenerative changes which had been brought on by his lifestyle, including the nature of his work, over a period of time of operating equipment on rough terrain, with resulting jarring and bouncing, and his recreational activity of performing in rodeos. This resulted in cumulative wear and tear to the claimant's spine, creating preexisting weakness in that area. *The doctor could not attribute the claimant's condition to a discrete identifiable injury, meaning that there was no separate or distinct injury which was causative of the claimant's problems."*

*Wynn, supra,* 105 Idaho at 105–06, 666 P.2d at 632–33 (emphasis added).

In addition, Bakes, J., favored us with *his own* impressions on his review of the record:

The evidence before the commission indicated that the claimant's lifestyle was

---

6. As discussed more fully herein, it is readily apparent that Justice Bakes has conveniently ignored the proposition that the referee based

her no-accident decision on a misperception of the *Wynn* case.

extremely strenuous and probably contributed a great deal to his bodily condition. Claimant had been involved in rodeo activities for twenty years. This activity resulted in severe punishment to his body. In addition, claimant had worked on heavy equipment for many years, resulting in much jarring and bouncing. Before the onset of symptoms that are the subject of this action, the claimant had been previously treated for back pain. In 1977, claimant suffered a low back injury at work. In 1979, a horse fell on claimant, causing back pain. In 1980, just weeks before the onset of symptoms claimant seeks to recover for here, claimant slipped on ice and suffered back pain. Thus, the commission's finding that claimant's spine had a pre-existing weakness is fully supported by the record.

*Wynn, supra,* at 106, 666 P.2d at 633. Justice Shepard, however, in writing for the majority, first shot down the pre-existing weak spine hypothesis, and then went to the real heart of the case, which was whether or not there had been an accident within the contemplation of the Worker's Compensation Law. In doing so, he has provided the Commission and the trial bar a ready review of this Court's recent and applicable case law where occurs the issue of an accident having or having not happened:

As this Court has repeatedly stated, "If the claimant be engaged in his ordinary usual work and the strain of such labor becomes sufficient to overcome the resistance of the claimant's body and causes an injury, the injury is compensable." *Whipple v. Brundage,* 80 Idaho 193, 327 P.2d 383 (1958); *Lewis v. Dept. of Law Enforcement,* 79 Idaho 40, 311 P.2d 976 (1957). In *Hammond v. Kootenai County,* 91 Idaho 208, 419 P.2d 209 (1966), this Court affirmed a Commission award when a deputy sheriff died of a rupture or occlusion of a major vessel within the brain while he was engaged in normal routine activities of investigating an accident scene. Claimant had for some years suffered from hypertensive cardiovascular disease. The Court, at 209, 419 P.2d at 210, quoting from *Pinson v. Minidoka Highway Dist.,* 61 Idaho 731, 106 P.2d 1020 (1940), stated:

"To constitute an 'accident' it is not necessary that the workman slip or fall or that the machinery fail. An 'accident' occurs in doing what the workman habitually does if any unexpected, undesigned, unlooked-for or untoward event or mishap, connected with or growing out of the employment, takes place."

Also, in *Dawson v. Hartwick,* 91 Idaho 561, 428 P.2d 480 (1965), this Court affirmed a Commission award to a claimant whose injuries in part resulted from stooping to lift a case of empty bottles while he was working in his usual occupation as a bartender. Therein the court reiterated the principles announced in *Hammond. See also Harding v. Idaho Department Store,* 80 Idaho 156, 326 P.2d 992 (1958); *Lyon v. Catron County Com'rs,* 81 N.M. 120, 464 P.2d 410 (N.M. Ct.App.1969); *Hauswirth v. Industrial Commission,* 92 Ariz. 251, 375 P.2d 733 (1962); 1B Larson on Workmen's Compensation § 38.20 (1982).

*Wynn, supra,* 105 Idaho at 104–05, 666 P.2d at 631–32.

It is important to keep in mind that the extensive dissent of Bakes, J., did not attempt any inroad on the validity of that review of the law, but rather contented itself with the argument that the Commission should be upheld on the basis of Justice Bakes' assessment of the noncredibility of Mr. Wynn:

Also, the evidence in the record indicated that claimant was not hurt quite so badly as he would have initially led the commission to believe. In the course of his testimony it was established that shortly after the claimed accident, while claimant was supposedly disabled from working because of the injury suffered on the job, he performed in rodeos approximately three times. Considering all the evidence, the commission, as the finder of fact, would be entitled to believe or

disbelieve claimant's testimony, depending upon its determination of his credibility.

Testimony presented by the claimant's doctor was also equivocal.

*Wynn, supra,* 105 Idaho at 107, 666 P.2d at 634.

Fortunately, in the *Wynn* case the meanderings of Bakes, J., did not command a single vote. Unfortunately, today like meanderings initiated in his January 1986 dissent now command a majority. His separate January 1986 opinion in this case agreed with the majority that the Commission had misconstrued the *Wynn* case, but insisted that the Commission should be affirmed because of the ultimate finding that the claimant's back problem "was not caused by an accident." His January opinion asserted in support thereof that such "is supported by substantial competent evidence." However, he was guilty of ignoring how the referee so rationalized, and he has wholly avoided pointing to that "substantial competent evidence." Perhaps he was referring to the report, and perhaps also the testimony of Dr. Bowman, and, as per his footnote no. 1 emphasizing the word "reasonably" modifying located as to time and place. But, as earlier mentioned, Bakes, J., wholly failed to acknowledge or consider the array of case law which the majority opinion, per Shepard, J., set forth—and is the law. Of a necessity, there should be found somewhere in his analysis some consideration of legal principles which would substantiate his assertion that the herniated disc suffered by Mrs. Hazen was not *a product of the strain of such labor while engaged in her work becoming sufficient to overcome the resistance of her body.*

One need pause but a moment to indulge in comparing Mrs. Hazen's pre-herniated-disc condition to Mr. Wynn's. As Bakes, J., worded it, Mr. Wynn's rodeo activities over 20 years had "resulted in severe punishment to his body." 105 Idaho at 106, 666 P.2d at 633. In 1977, he had suffered a low back injury at work; in 1979, a horse fell on him, causing back pain; in 1980, he slipped on ice and suffered back pain. *Id.*

Mrs. Hazen, on the other hand, had no such history, and initially did not know that she had a *back* problem, because at the outset she suffered *leg* pains, not back pains. Before her employment with the store she had previous employment in California as a United States postal clerk. In short, she had not severely punished her body, or even punished it in the slightest. Missing from her pre-disc-discovery history is any indication of a weak spine predisposing her to a herniated disc. Her arthritis was minimal.

Even a moderately close attention to the medical documentation shows that the treating doctors experienced considerable difficulty in determining that there was a disc problem at the root of her leg pains— the very pains which both she and her supervisor concluded must be attributable to lack of proper footwear for the type of work being done. While Dr. O'Brien, in generalized opening remarks at his deposition did mention that she related "serious back pain" dating back two months prior to seeing him on August 25, 1983 (Deposition, p. 6), his written report makes it evident that Mrs. Hazen's leg pain commenced in the hip, and caused the most severe pain in the legs, but also provided her with "some back pain." His report shows the doctor's conclusion on the first examination that there were some *"vague signs of an L5–S1 nerve root compression."* He ordered a CT scan to verify that conclusion. It is to be remembered that his examination and report, and the CT scan and report are all prelitigation. The doctor's August 25 findings which resulted from the CT scan are:

L3–4: The disc has a normal appearance without focal protrusion and the facet joints are normal.

L4–5: There is focal central/right sided disc protrusion at the disc space with some high density material which is the density of disc material in the superior right lateral recess of L5 which could represent volume averaging or frank extension of contiguous free fragment into the superior lateral recess. The facet

joints exhibit narrowing and some sclerosis on the left, but there is no large facet osteophyte.

L5–S1: Posterior to the inferior body of L5, there is a high density mass in the anterior aspect of the spinal canal. While an artifact could produce this appearance, an extruded free disc fragment could also give this appearance. The disc itself shows a very tiny focal superior central protrusion which does not contact the thecal sac or the axillary portions of the S1 nerve rootlets.

Abdomen/Pelvis: No abnormalities are seen in visualized portions.

And the impressions were:

RIGHT POSTERIOR L4–5 DISC PROTRUSION MOST CONSISTENT WITH HERNIATED DISC, QUESTION CONTIGUOUS EXTRUDED FREE FRAGMENT IN THE SUPERIOR ASPECT OF THE RIGHT LATERAL RECESS OF L5. SEE ABOVE DISCUSSION.

TINY FOCAL CENTRAL SUPERIOR L5–S1 DISC PROTRUSION MOST CONSISTENT WITH A VERY TINY CENTRAL HERNIATION OF QUESTIONABLE CLINICAL SIGNIFICANCE (SEE ABOVE DISCUSSION).

ARTIFACT VS. LARGE FREE FRAGMENT OF DISC MATERIAL POSTERIOR TO THE INFERIOR BODY OF L5. MILD TO MODERATE DEGENERATIVE FACET JOINT DISEASE OF THE LEFT L4–5 FACET JOINT.

Deposition of O'Brien, Ex. 2.

A lumbar myelogram was performed on the very next day, the 26th day of August.

Without doubt the most telling evidence before the referee was, or certainly should have been, the hospital records of Dr. Cindrich. Following the myelogram, he admitted her to the hospital for a CT scan. His report of August 28, 1983 speaks for itself:

**SAINT ALPHONSUS REGIONAL MEDICAL CENTER**

MEDICAL RECORD DEPARTMENT

| PATIENT | PHYSICIAN | DATE ADMITTED | DATE DISCHARGED |
|---|---|---|---|
| HAZEN, MYRTLE | P.J. CINDRICH, M.D. | 8/28/83 | |

HISTORY & PHYSICAL

Mrs. Hazen is a 60 year old female who has had a 2 month history of back and right lower extremity pain. Predominantly the pain is right lower extremity at this point. She feels that it issues from the low back area, radiates through the buttock and down the posterolateral aspect of the right lower extremity to the heel and ankle, never into the toes. She denies any numbness with this, denies focal weakness and denies bowel or bladder symptoms. The left lower extremity has not given her any problem This has been unresponsive to multiple modes of conservative therapy. She has never had back injury nor surgery previous to this

PAST MEDICAL HISTORY: Essentially negative. She denies medical problems. SHE DENIES ANY ALLERGIES. She denies taking any medications presently.

PHYSICAL EXAMINATION: She shows good spinal motions, with some limitation of right lateral flexion and some of forward flexion. She has a mild amount of spasm in her low back area. She is tender in the right SI area as well as in the right sciatic notch. Gait is normal on toes and heels. Further strength testing shows normal iliopsoas, quads, hamstrings, anterior tibs and toe extensors, posterior tibs, and peronei as well as gastrocs. Sensation is preserved throughout all lower extremity dermatomes. Reflexes are symmetric although decreased both in knees and ankles, but improved with reinforcement. Toes are downgoing bilaterally. Chest is clear. Heart is regular. X-ray examination: On CT scan she shows an L4–5 disk protrusion with possible free fragment; a small L5–S1 disk herniation. Myelogram done on Friday shows a large central type disk herniation at L4–5 with impingement of both L5 nerve roots. There is no encroachment of the sac at the L5–S1 level. There is a small suggestion of a disk at the L2 level, also on the right.

IMPRESSION: L5 RADICULOPATHY, RIGHT LOWER EXTREMITY, SECONDARY TO L4–5 DISK HERNIATION.

RECOMMENDATIONS: READMISSION FOR LAMINECTOMY AND REMOVAL OF THE DISK.

The indications, alternatives and risks have been discussed in detail with the patient and her daughter, and both wish to proceed Monday.

/s/ P.J. Cindrich
P. J. CINDRICH, M.D.

She had surgery the next day, August 29, 1983; the doctor filed his post-operative report the same date. That report, too, speaks for itself:

**SAINT ALPHONSUS REGIONAL MEDICAL CENTER**

MEDICAL RECORD DEPARTMENT

| PATIENT | PHYSICIAN | DATE ADMITTED | DATE DISCHARGED |
|---|---|---|---|
| HAZEN, MYRTLE A. | PATRICK CINDRICH, M.D. | | |
| 3–07854–0 | | | |

**990**

OPERATIVE REPORT 8–29–83

PRE OP DIAGNOSIS: L5 RADICULOPATHY ON THE RIGHT WITH HERNIATED DISC AT L4–5.
POST OP DIAGNOSIS: SAME.
PROCEDURE: PARTIAL HEMILAMINECTOMY, L4–5 ON THE RIGHT, WITH REMOVAL OF DISC.
ASSISTANT: ALAN UPCHURCH.

Under general endotracheal anesthetic, the patient was rolled to the prone position and the lumbar area was shaved, prepped, and draped in the usual manner. Through a midline skin incision from L3 through the sacrum, the fascia was incised and the muscles reflected in a subperiosteal manner. After localizing x-ray was obtained, partial hemilaminectomy was performed at the L4–5 interspace. Ligament was removed with sharp dissection and a plane was developed in the epidural fat after which the nerve root was identified and retracted medially. A large disc protrusion was noted at this level. The disc space was incised after epidural veins were coagulated with bipolar coagulation and using assorted pituitary punches the disc was removed piecemeal. A large amount of disc material was obtained. At the end of the procedure the right L5 nerve root was noted to be quite relaxed and under no tension. No free fragments were felt around the area of the nerve root nor above nor below the interspace. Hemostasis was obtained with bipolar coagulation. A free fat graft was left at the operative site and after hemostasis was obtained in the muscle layer, muscle and fascia were closed with 2–0 Vicryl sutures, interrupted. Subcutaneous layer was then closed with interrupted 3–0 Vicryl sutures and skin was closed with interrupted 3–0 Neurolon mattress sutures. Dry dressing was supplied and the patient was taken to the recovery room.

/s/ P.J. Cindrich
PATRICK CINDRICH, M.D.

She was discharged on September 2, 1983, at which time the doctor filed his discharge summary:

**SAINT ALPHONSUS REGIONAL MEDICAL CENTER**

MEDICAL RECORD DEPARTMENT

PATIENT     PHYSICIAN     DATE ADMITTED     DATE DISCHARGED

HAZEN, MYRTLE   PATRICK CINDRICH, M.D.   9–2–83
3–07854–0

DISCHARGE SUMMARY

Miss Hazen is a 60-year-old female who had a two-month history of back pain and right lower extremity pain with no symptoms on the left. This was unresponsive to multiple modes of conservative therapy. Past medical history was negative.

Physical examination showed good motions with limitation of right ankle flexion and some forward flexion. Sensation was preserved. Strength was preserved. Reflexes were symmetrical, although depressed in both knees and ankles. This was improved with reinforcement. Toes are downgoing. Chest is clear. Heart regular. CT scan showed L4–5 disc

protrusion with possible free fragment and a small L5–S1 disc herniation. Myelogram done shows a large central disc herniation L4–5 with impingement of both L5 nerve roots with no encroachment of the sac of the L5–S1 level. There was also a small suggestion of a disc at L2. The impression was L5 radiculopathy, right lower extremity, secondary to L4–5 disc herniation. The indications, alternatives, and risks to proposed surgery were discussed with the patient in detail and she agreed to laminectomy. A right L4–5 partial hemilaminectomy was performed with removal of a large amount of disc. Post-operatively the patient did well. Her leg pain was gone. She followed an essentially uneventful post-operative recovery course and was dismissed on 9-2-83 to be seen in office followup or to return prn neurologic symptoms.

FINAL DIAGNOSIS: HERNIATED DISC.
PROCEDURE: LAMINECTOMY.

/s/ P.J. Cindrich
Patrick Cindrich, M.D.

That report, too, speaks for itself. All of the findings and reports of both Dr. O'Brien, a specialist in orthopedics, and Dr. Cindrich, a specialist in neurological surgery, tend in no direction but to demonstrate that Mrs. Hazen was a classic case of herniated disc injury—which first manifested itself primarily in pain located in the legs—but having its origin and cause in the spine.

Taken in its entirety, the treating doctors suspected a disc, confirmed the suspicion, and surgery immediately followed. After a successful convalescence, the symptoms (pain) caused by the herniated disc were alleviated. Mrs. Hazen had some post-operative pain, and could not return to work. The doctors have variously rated her medical impairment, but her permanent disability has yet to be rated. The doctors when last heard from were of the opinion that she could not and should not return to her former type of employment.

The referee simply did not function properly. The case slipped by the Commission. Nine months ago, the Court readily saw enough (less than portrayed herein) to remand the case to the Commission. The efforts of Justice Bakes have so far frustrated a fair hearing before the Commission, which should have taken place months ago.

Fortunately, this may not be the end of the matter. This court on many occasions

has had to reconsider its views on petitions for rehearing, and on doing so has reached conclusions differing from those first reached. If my extensive inquiry into this record fails to impress any of those who now comprise the majority, and if the Court's decision as now written by Justice Bakes becomes final, the Commission, on observing the manifest injustice which has been done Mrs. Hazen, has the power to reopen the case. I, for one, will be extremely disappointed if that does not come to pass. In prior opinions, I have bemoaned the work burden with which the Commission has had to endure, and the outrageously low annual compensation the Commissioners have been privileged to receive. There is not the least bit of doubt in my mind but what the Commission, on reading the extensive evaluations of the case which Justice Huntley and I have made—and which the referee unfortunately did not make—will take the action appropriate to securing to the working men and women of Idaho the "sure and certain" relief which an enlightened legislature promised to the people well over a half century ago.

HUNTLEY, J., concurs.

## APPENDIX A

Filed: January 31, 1986

Appeal from the Industrial Commission of the State of Idaho.

Appeal from a decision of the Industrial Commission denying benefits for failure to establish a compensable accident. *Reversed and remanded.*

HUNTLEY, Justice.

Myrtle Hazen testified that on May 16th, 17th, and possibly the 18th of 1983, during a "grand-opening," she lifted between eighteen and twenty-four cases of pop weighing thirty to thirty-five pounds each and carried them thirty to thirty-five feet as part of her duties at the General Store where she was employed. These were the heaviest items she carried at any time during her employment. Her ordinary duties involved lifting canisters of pop and stocking the store's shelves.

Hazen began experiencing sharp pain in her right leg on May 17th or 18th, twelve to forty-eight hours after carrying the cases of pop. She also had pain in her lower back. She never had any problem with leg or back pain prior to May 17, 1983. After two to three weeks the pain became severe. She first went to see a chiropractor, Dr. Squires, who recommended her to Dr. Michael O'Brien, whom she saw on August 25, 1983. Dr. O'Brien diagnosed a herniated disc in her back. He testified it probably resulted from her work, however he could not identify any particular time at which the herniation occurred. He further testified it was not abnormal for the pain from a herniation to increase gradually as it did. On August 29, 1983, Hazen underwent surgery for the herniated disc. On April 12, 1984, Dr. Ercil Bowman examined Hazen on behalf of the General Store. Dr. Bowman testified the rupture came on gradually and was not due to any particular incident, but rather to wear and tear. However, his opinion was not based on the fact that Hazen started getting sharp pains within about twenty-four hours after the heaviest lifting she ever did at the store. When he took this into account, he admitted the onset of pain was not inconsistent with a herniation at the time of the lifting.

In Hazen's application to the commission for a hearing, she claimed her injury occurred between July 9 and July 16, 1983, due to the lifting of crates of food for stocking the store's shelves. She later amended the application to say the injury occurred between May 13 and May 23, 1983,[1] as a result of lifting the cases of pop. Nevertheless, she told her employer in August of 1983 she had a back problem,

1. Hazen consistently maintained that the injury occurred during the grand-opening and explains her having given her attorney the incorrect July date by the fact that she met with her attorney only a few hours after returning from the hospital where she had been advised that her husband was terminally ill.

but that it was not due to an injury on the job.

After the hearing upon Hazen's application for Worker's Compensation benefits the Industrial Commission held Hazen failed to prove she suffered an accident as defined by I.C. § 72–102(14)(b) (1983). The commission reasoned that this Court had, in *Wynn v. J.R. Simplot Company*, 105 Idaho 102, 666 P.2d 629 (1983), retained the requirement an accident be "definitely" located as to time and place. The commission concluded Hazen could not recover because she failed to prove the injury causing mishap occurred at a particular time and place.

In *Wynn* the commission denied a claim for Worker's Compensation benefits on grounds the claimant failed to show a distinct mishap caused the injury. This Court reversed, finding the evidence established the mishap occurred at a particular time and place entitling the claimant to relief under the Worker's Compensation Act. *Wynn*, 105 Idaho at 104, 666 P.2d at 631. The commission below interpreted *Wynn* as establishing the legal definition of "accident" under the Worker's Compensation Act. Hazen, on the other hand, asserts *Wynn's* determination that the injury occurred at a particular time and place was merely a finding of fact which fell well within the broad legal standard of I.C. § 72–102(14)(b) (1983), which requires only that the injury causing mishap be "reasonably" established as to time and place.

*Wynn* does not attempt to define the term accident for purposes of the Worker's Compensation Act. *Wynn's* facts and holding are consistent with the definition of accident in I.C. § 72–102(14)(b) (1983). No language in *Wynn* justifies the commission's interpretation of the case as altering that statutory definition.

The commission applied the same legal standard as that set forth in the Worker's Compensation Act (Act) from 1939 until 1971:

"Accident," as used in this law, means an unexpected, undesigned, and unlooked for mishap, or untoward event, happen-

ing suddenly and connected with the industry in which it occurs, and which can be *definitely* located as to time when and place where it occurred, causing an injury, as defined in this law.

I.C. § 72–201 (1939–70) (emphasis added).

In 1971 the legislature substituted the word "reasonably" for the word "definitely":

"Accident" means an unexpected, undesigned and unlooked for mishap, or untoward event, connected with the industry in which it occurs, and which can be *reasonably* located as to time when and place where it occurred, causing an injury.

I.C. § 72–102(14)(b) (1971–83) (emphasis added).

In substituting the word "reasonably" for the word "definitely" the legislature rejected the standard applied by the commission and adopted the standard urged upon us by Hazen. The commission therefore erred in applying the wrong legal standard.

The commission argues in the alternative that Hazen failed even to "reasonably" locate the time and place of her injury causing mishap. However, determination of this issue requires the resolution of questions of fact. The commission's findings restate the evidence rather than resolve factual issues and so are of little assistance on appeal. The parties offered conflicting evidence on the factual issues. For example, Hazen testified she experienced the onset of pain within forty-eight hours after doing the heavy lifting she believes caused her injury. Expert testimony indicated the pain was consistent with the herniation of a disc during that lifting. However, the experts could not say with reasonable medical certainty that the herniation occurred in any particular one or two day period. This was partly due to the fact Hazen did some heavy lifting prior to the lifting she blames for her injury and on various occasions made statements indicating she made no connection between the May lifting and her injury. This sampling of evidence shows

factual issues remain for resolution. We therefore reverse and remand for further proceedings consistent with this opinion.

Costs to appellant. No attorney fees awarded.

DONALDSON, C.J., and BISTLINE, J., concur.

BAKES, Justice, concurring in part and dissenting.

I concur with that portion of the majority opinion which holds that the commission, in its Conclusion of Law No. I, misconstrued the court's holding in *Wynn v. J.R. Simplot Company*, 105 Idaho 102, 666 P.2d 629 (1983). In that Conclusion of Law the commission held, relying on our decision in the *Wynn* case, that "the Supreme Court has retained the requirement that in order to constitute an accident the claimant must show that he suffered his injury at a particular time and at a particular place." What the court held in *Wynn*, was that the claimant in that case had actually shown that he had had an accident at a particular time and a particular place, not that he was required to show that he had had an accident at a particular time and a particular place. Accordingly, I agree with the majority that to that extent the commission misperceived the holding in *Wynn*.

However, that does not necessarily require the reversal in this case. The claimant had argued in this case that the evidence established that she had suffered an accident, reasonably located as to its occurrence and was therefore entitled to benefits based on the *Wynn* case. The commission, in its Conclusion of Law No. I acknowledged that claimant was arguing that "she suffered an accident, reasonably located as to its occurrence and is therefore entitled to the receipt of Worker's Compensation benefits." Nevertheless, the commission concluded that "the claimant's injury occurred gradually over a period of time and

was not caused by an accident as defined by § 72–102(14). Idaho Code." Thus, even though the commission may have misconstrued the holding in the *Wynn* case, the foregoing finding (which was actually denoted as a conclusion of law) that claimant's injury occurred gradually over a period of time and was not caused by an accident, was not affected by the misinterpretation of the holding in the *Wynn* case.

When the legislature changed the wording of the statute from "definitely" to "reasonably"[1] it did not change the definition of accident from "an unexpected, undesigned and unlooked for mishap, or untoward event," but merely gave some latitude in the claimant's requirement to give notice as to when and where the accident occurred. Thus a claimant would not have to establish the exact day and precise location that his accident occurred in order to be entitled to benefits if he could establish the time and place of the accident within reasonable parameters. However, an accident as defined in the statute as amended still requires "an unexpected, undesigned and unlooked for mishap, or untoward event." The change of the word "definitely" to "reasonably" did not mean that an accident can now constitute an accumulation of stressful but regular employment activities stretched out over a long period of time. An accident still must be a "mishap" or an "event."

Accordingly, even though the commission may have misconstrued the *Wynn* case to require a claimant, if he had had an accident, to identify "a particular time and ... particular place that the accident occurred," nevertheless the commission found as a matter of fact that claimants condition occurred gradually over a period of time and was not caused by an accident. That finding is supported by substantial competent evidence in the record, and accordingly I would affirm the order of the Industrial Commission. While the commis-

---

1. In 1971 the legislature substituted the word "reasonably" for the word "definitely":

"Accident" means an unexpected, undesigned and unlooked for mishap, or untoward event, connected with the industry in which it oc-

curs, and which can be *reasonably* located as to time when and place where it occurred, causing any injury.

I.C. § 72–102(14)(b) (1971–83) (emphasis added).

sion erred in its interpretation of the *Wynn* case, that err did not effect the commission's ultimate finding that the claimants back problem "was not caused by an accident."

The order of the commission should be affirmed.

SHEPARD, Justice, dissenting.

I disagree with the majority's categorization of *Wynn v. J.R. Simplot Company,* 105 Idaho 102, 666 P.2d 629 (1983), and the majority's view of the commission's application of *Wynn* in the instant case.

The Court stated in *Wynn:*

"The sole question presented is whether, as held by the Commission, the claimant failed to establish that his condition was caused by an 'accident' i.e., a distinct mishap or event.

"At a precise time on a precise day, i.e., 7:30 p.m. on March 17, 1980, claimant-appellant Wynn suffered a 'documented left C–3–4, soft disc herniation,' which the uncontroverted testimony of his attending physician indicated occurred 'while he was working his front end loader' when, 'in my medical opinion, forces exerted on his C–3–4 ligamentous structure, at that point in time, exceeded their limits and he suffered the resultant disc protrusion and disability.'"

The only evidence in *Wynn* was presented by the claimant and the Court said:

"The uncontradicted evidence is contrary to the Industrial Commission's finding that claimant's symptoms were not caused by a ruptured disc ... Hence, there is no evidence to support the finding of the Commission that claimant's symptoms were not caused by a disc rupture and that finding is reversed."

The Court's decision in *Wynn* concluded with the statement:

"In sum, this is not a case in which the Industrial Commission made findings and drew conclusions from controverted evidence, in which event we would ordinarily sustain the Commission. Rather, in the instant cause the evidence was uncontradicted and reveals that the claimant Wynn was injured while working at his usual and ordinary labor and the stress of that work overcame the resistance of his body which was admittedly predisposed to such injury. The injury produced the symptomatology and the disability from which claimant suffered."

In contrast to the facts of *Wynn,* it is my view that the medical testimony in the instant case was at best inconclusive in establishing that claimant's disability resulted from an accident, mishap, or event occurring during employment, or whether there had been a "general progression" of a problem. The medical testimony was further controverted by a medical opinion that the claimant "had a gradual onset of disc disease from wear and tear of the ordinary activities of life."

Hence, it is my opinion that the findings and conclusions of the referee which were adopted by the commission are supported by the evidence in this case and should not be overturned.

## APPENDIX B

**Ercil R. Bowman, Jr., M.D.**

Orthopaedic Surgery

6 April 1984

Moffatt, Thomas, Barrett & Blanton

Post Office Box 829

Boise, Idaho 83701

Re: Myrtle Hazen
MTB & B File # 13–989

Dear Sirs:

Mrs. Myrtle Hazen was seen in my office on 2 April 1984 because of back surgery performed on 29 August 1983. She stated that everything is fine "Except I can't lift anything without pain". She repeated variations of this statement throughout the course of the interview. The history obtained, as far as this occurrence, is that she had a gradual onset of pain at work without any specific date of injury. She states "After a couple of months or so I went to a chiropractor". She saw him for two months and then saw Dr. Michael O'Brien

who referred her to Dr. Cindrich "Who did the surgery". She states that pain occurs on lifting. As little as ten pounds will cause it. The pain is lumbosacral and she states "Got rid of all my leg pain". She states her right leg initially was worse than the left. She states further "Same on the left but more continual on the right". This, of course, being her pre-operative state. She has a prescription for pain medication but doesn't use them unless she lifts and lifting is the only thing that causes pain. She had a post-op CT scan. She has had no x-rays since that time until seen in this office. She specifically denies any prior problems. She works in a convenience store gas station and now has to lift objects. Apparently she feels that her problems came on when the gas station became more than a gas station and became a convenience store. She has had no change in her condition in the past two months.

She has no known allergies, takes no medications regularly. She uses no tobacco, rarely uses alcoholic beverages. She has only been hospitalized for the back surgery and a hysterectomy. She denies any other known medical problems.

Examination reveals a five foot four inch tall, 164 pound lady who stands normally with minimal spasm and has a normal gait. She is tender over both posterior superior iliac spines and paravertebrally in the lumbar area. There is an equivocal decrease in motion in flexion in her back and she apparently has some pain on full flexion. Straight leg raising tests are negative while sitting, they are positive at eighty (80) degrees on the right and sixty (60) degrees on the left while supine. In a supine position she will not flex her hips past ninety (90) degrees even though the knee is flexed.

X-ray examination reveals that she has narrowing of the facet joints at L5, S1 and less so at L4, 5. Generally speaking there is a minimal amount of arthritis considering age and past history.

On examination this lady has a paucity of findings. In addition, her affect is quite interesting when she states that everything is all right except she can't lift. This, of course, precludes her returning to her job at the convenience store. If we accept the history as given here in the office that this lady has had no prior back problems until, as it was given,—last spring—we have to conclude that she did not have a specific single incident. This was then a gradual onset thing perhaps secondary to repeated lifting and moving cases of food and beverage in a convenience store or some other unknown event. On the other hand, if this lady does have a prior history of back problems the logical conclusion to be reached is that she has had, in fact, an ongoing problem with the aging process which was aggravated by her occupation. In any event, at this point in time, it appears to me that her condition is stable and it appears that way from her history. Accordingly, according to the Manual for Orthopaedic Surgeons Evaluating Physical Impairment published by the American Academy of Orthopedic Surgeons, she has a physical impairment rating of ten per cent (10%) whole body. This physical impairment, of course, is present irrespective of mode of onset of her problem that led to surgery. She is clinically stable.

Sincerely,

/s/ Ercil R. Bowman, Jr.

Ercil R. Bowman, Jr., M.D., P.A.

ERB:pa

### APPENDIX C

IC 83–445831

BEFORE THE INDUSTRIAL COMMISSION

STATE OF IDAHO

Sept. 25, 1984

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

The Commission assigned the above-entitled matter to Referee Aliza D. Bethlahmy, who conducted a hearing in the matter on April 12, 1984 in Boise, Idaho. The matter was then continued to permit the parties to take additional depositions. The depositions of Dr. O'Brien, Dr. Squire, and Dr.

Bowman were taken and are admitted, respectively, as Exhibits # 7 through 9. After all of the evidence was submitted, a briefing schedule was established. The final brief having been submitted, the matter is now ready for decision.

Now, having considered all of the evidence submitted in this matter and having considered the parties' post-hearing briefs, the Referee enters the following proposed Findings of Fact, Conclusions of Law, and Order, which she recommends the Commission approve and adopt as its decision.

## FINDINGS OF FACT

### I

The Claimant, Myrtle Hazen, was born October 13, 1922. She has a ninth-grade education.

In January or February of 1980, the Claimant began working as a gas station cashier. After approximately one year, the station was changed to a Shell station. The Claimant's duties remained the same; i.e., collecting money for the fuel.

In January of 1983, the station came under new ownership. The Claimant was retained as an employee by the new owner.

In early 1983, the Defendant-Employer expanded his business by constructing a convenience store on the same location as the gas station.

When the new building was completed, the cashier-clerks still sold gasoline, oil, and cigarettes, but they also sold groceries, beer, and pop. The employees' lifting duties included lifting cases of beer and pop and moving them when stocking the merchandise. The store also had a fountain and, depending on the weather, the number of sixteen ounce cans and bottles it was necessary for the cashier-clerk to move would vary. The number of cylinders of pop the cashier-clerk would move each day also varied.

The Claimant testified that prior to May 13, 1983, she would move one or two cylinders of pop per day.

### II

The general store's grand opening was held on May 13, 14, and 15 of 1983. As part of the store's grand opening, customers purchasing $2 worth of goods from the store were given a quart-size bottle of soda pop.

The Claimant only worked one of the three days of the store's grand opening. She worked on Saturday, May 14, 1983. She also worked May 16 through May 19.

The Claimant testified that during the store's grand opening, her duties included pulling cases of coke out of a delivery van and moving them to the front of the station and stacking them so they would be available for the customers. She testified that each case weighed approximately thirty to thirty-five pounds and that she moved approximately eighteen to twenty-four of the cases on Monday, May 16, 1983. The Claimant testified that she had not performed any unusual work on the 14th of May, but that on the mornings of May 16 and 17 she had to move the cases of pop. She also testified that she believed that she had moved cases of pop on Wednesday, May 18, 1983, but the Defendants testified that the van was moved from the premises of the general store on the afternoon of May 16, 1983.

The Claimant testified that in the evenings after performing her work in mid-May, 1983, she was tired and ached all over and had a sharp pain in her right leg. She also had a sharp pain in her hip and down the small of her back. At the hearing, the Claimant identified the onset of pain as being Tuesday, May 17 or Wednesday, May 18, 1983.

The Claimant's pain subsequently changed to a constant aching pain and approximately three to four weeks after the initial onset of pain, the Claimant had a discussion with her supervisor about the pain she was experiencing in her legs. The two women discussed the problem on several occasions, and they thought the problem might be due to inadequate support for

the Claimant's legs. The Claimant and her supervisor thought that perhaps the type of shoes which the Claimant was wearing was the problem, and the Claimant purchased a pair of shoes with an arch support. She hoped that the arch support in the new shoes would alleviate the pain she was experiencing. The new shoes did not help.

The pain which the Claimant was suffering from did not affect her performance of her job duties, but she testified that she did not do anything at home after she left the job.

### III

In the first part of August, 1983, the Claimant went to Dr. Squires, a chiropractor, because of the severity of the pain she was experiencing.

The Claimant told Dr. Squires that she had no idea of the cause of the pain and that it had come on gradually. The only heavy lifting she had done was of the cylinders and the cases of beer and coke.

The Claimant saw the chiropractor from August 2, 1983 to August 23, 1983 when he referred her to Dr. O'Brien.

### IV

The Claimant saw Dr. O'Brien, a neurologist, on August 25, 1983. He scheduled her for a CAT scan and myelogram on August 26, 1983.

The Claimant told her employer that she would not be in to work on August 26, 1983, that she had a herniated disc and needed surgery. August 24, 1983 was the Claimant's last day of work at the general store. The Claimant underwent surgery on August 29, 1983.

### V

Dr. Squires testified that he and the Claimant discussed the Claimant's occupational role at the store, but they did not discuss a specific date or a specific cause of the Claimant's injury. See Deposition of Dr. Squires, Page 12, Line 13 to 23.

Dr. Squires assumed that the Claimant's problem was "occupationally related", but he did not identify any specific incident. See Deposition of Dr. Squires, Page 17, Line 4 to 18, Page 18, Line 1 to 16.

### VI

The history the Claimant gave Dr. O'Brien on August 25, 1983 was that she had had a problem with serious back pain for approximately two months prior to seeing him. The Claimant's history was that the back pain had moved into her back for approximately a month before that time. See Deposition of Dr. O'Brien, Page 6, Line 15 to 24.

Dr. O'Brien's opinion was that the Claimant's injury was caused by her work; i.e., that the Claimant's disc herniation was caused by the heavy lifting she did at work.

Dr. O'Brien indicated that he had been told that the Claimant had to lift heavy cylinders for the dispensing machines for the pop and the cylinders were quite heavy and apparently the Claimant told Dr. O'Brien that was her problem with the lifting. See Deposition of Dr. O'Brien, Page 32, Line 7 to 19.

Dr. O'Brien was unable to pinpoint the time of injury, but his view was that there was a general progression of the problem to where the Claimant needed surgery. See Deposition of Dr. O'Brien, Page 36, Line 24 to Page 37, Line 9.

Dr. O'Brien would give the Claimant a 13.3% whole man permanent partial impairment rating. See Exhibit #8 attached to Deposition of Dr. O'Brien.

### VII

Dr. Bowman testified in this matter and expressed the viewpoint that the Claimant's activities in the middle of May, 1983, were not the cause of the Claimant's injury

which resulted in her undergoing surgery in August, 1983. He indicated that his opinion was that the Claimant had a gradual onset of disc disease from wear and tear or the ordinary activities of life.

In a letter dated April 6, 1984, Dr. Bowman would give the Claimant a rating of ten percent permanent partial impairment and wrote the following:

"If we accept the history as given here in the office that this lady has had no prior back problems until, as it was given,—last spring—we have to conclude that she did not have a specific single incident. This was then a gradual onset thing perhaps secondary to repeated lifting and moving cases of food and beverage in a convenience store or some other unknown event. On the other hand, if this lady does have a prior history of back problems the logical conclusion to be reached is that she has had, in fact, an ongoing problem with the aging process which was aggravated by her occupation." See Deposition Exhibit #1 of Bowman Deposition.

## VIII

The Referee is persuaded by the bulk of the evidence whereby the Claimant testified she was not able to identify a specific incident and the various statements she told both the physicians and her supervisor at work that, in essence, the pain "came on gradually", that the Claimant's personal injury occurred over a substantial period of time.

The Referee finds that the Claimant's herniated disc was not the result of an accident but rather occurred over a longer period of time and "came on gradually".

## CONCLUSIONS OF LAW

### I

The initial issue to be resolved in this matter is whether the Claimant has established that she suffered an "accident" within the meaning of the Idaho Workmen's Compensation Act.

The Claimant argues that she suffered an accident, reasonably located as to its occurrence and is therefore entitled to receipt of workmen's compensation benefits. Counsel for the Claimant relies heavily on the case of *Wynn v. J.R. Simplot Company*, 105 Idaho 102, 666 P.2d 629 (1983). The Referee believes that unlike the *Wynn* case, wherein the Supreme Court found that Mr. Wynn had suffered an accident and injury at a precise time on a precise day and was therefore entitled to workmen's compensation benefits, the evidence presented in this case is distinguishable in that the Claimant's injury occurred gradually over a period of time and was not caused by an accident as defined by Section 72–102(14), IDAHO CODE.

Inasmuch as the Claimant has proceeded under an "accident" theory and not an occupational disease theory and inasmuch as the Supreme Court has retained the requirement that in order to constitute an accident the Claimant must show that he suffered his injury at a particular time and at a particular place, the Referee concludes that the Claimant in this case has failed to meet her burden of proof.

The Referee therefore concludes that the Claimant has failed to establish that her herniated disc was caused by an accident within the meaning of the Idaho Worker's Compensation Law.

### II

Because of the Referee's conclusion that the Claimant did not suffer an accident, she deems it unnecessary to address the issue of notice, but does wish to point out that even the testimony presented relative to the issue of notice establishes that the Claimant's problem had a gradual onset, and when the Claimant and her supervisor discussed the Claimant's problem, the discussion was in the context of the origin of the Claimant's problem being unknown but that they assumed that the pain she was experiencing in her legs was caused by her

general work and the standing at the general store. See Excerpt of Proceedings, Page 11, Line 2 to 6.

Regardless of that point, since the Referee concluded that the Claimant did not suffer an accident, there is no need to address the issue presented by Section 72–701, IDAHO CODE.

The Referee recommends that the full Commission approve the following order denying the Claimant's application for workmen's compensation benefits.

### ORDER

IT IS HEREBY ORDERED, and this does order, that the Claimant's application for workmen's compensation benefits be, and the same is, hereby DENIED.

/s/ Aliza D. Bethlahmy
Aliza D. Bethlahmy, Referee

### ORDER

The Commission has reviewed the record and the foregoing Findings of Fact, Conclusions of Law and Order, and hereby approves and confirms the same, and adopts them as the Decision and Order of the Commission. The Decision is ordered filed by the Secretary of the Commission.

DATED and FILED this 25 day of September, 1984.

INDUSTRIAL COMMISSION
/s/ Will S. Defenbach
Will S. Defenbach, Chairman
/s/ Gerald A. Geddes
Gerald A. Geddes, Member
/s/ Lawrence G. Sirhall
Lawrence G. Sirhall, Member

BISTLINE, Justice, dissenting.

With the curtain dropping on Mrs. Hazen's attempt to obtain the "sure and certain relief promised by the Workmen's Compensation Law, I write one last time to lament the failure of this Court to see that justice is administered fairly and freely.

When we first heard the appeal, the controlling issue as stated by the surety was:

Is there substantial, competent evidence to support the finding of the Industrial Commission that claimant failed to carry her burden of proving that she sustained an "accident," which means an unexpected, undesigned, and unlooked for mishap, or untoward event, connected with the industry in which it occurs, and which can be reasonably located as to time when and place where it occurred?

That issue was similarly stated in Mrs. Hazen's brief:

Did the Commission err in holding that the Appellant-Claimant was required to prove that her accident happened at a particular place and at a particular time?

Much of the surety's brief was addressed to *Wynn v. J.R. Simplot Co.,* 105 Idaho 102, 666 P.2d 629 (1983), and cases from this Court which were concerned with repetitive trauma. That brief was mainly responsive to Mrs. Hazen's brief wherein it argued that *Wynn* had been misapplied by the referee.

Our first opinion agreed that the referee erred in her reading of *Wynn* —and we held that her misapplication of law to the facts in evidence necessitated another hearing, and we expected that it would be the Commission itself who would preside thereat. Justice Bakes, however, did not believe that Mrs. Hazen should have that opportunity of going before the Commission itself. He suggested that, notwithstanding his continued agreement that the referee erred, Mrs. Hazen in his view had not shown an accident.

A rehearing was had and, by garnering a change of one vote, the surety has prevailed. Mrs. Hazen is wrongfully put out of court, so to speak, unless the Commission intercedes on her behalf and affords her the hearing which the Court once believed she should have—before one mind was changed. It is a clear case of manifest injustice—an injustice not occasioned by the surety, but by the Court in denying her a fair hearing. Observe the following:

Nowhere in the majority opinion (nor in the referee's, either) is Dr. Cindrich's name mentioned. It appears that his reports have gone unnoticed and unconsidered, just as with the doctor himself. To most practitioners in this field, it will be incomprehensible that the operating surgeon is wholly ignored.

Worse yet, a rereading of a majority opinion commonly suggests that the author of the majority opinion has inadvertently assumed that Dr. Bowman—the mainstay witness in the eyes of the referee—was *the* operating surgeon. Not so, however, as was thought to have been pointed out. It was the testimony of this doctor that the referee chose over the treating physician's. What was his testimony? Aught but an answer to a hypothetical question about the causes of the condition of a woman whom he had never seen until long after Dr. Cindrich performed the required surgery. Was Dr. Bowman impeached? Of course he was, giving an entirely different answer to the hypothetical question when counsel for Mrs. Hazen cranked in Mrs. Hazen's version of her history.

The manifest injustice here is not urged as being that Mrs. Hazen is entitled to compensation. Not at all. But she is entitled to an error-free hearing where three experienced Commissioners give proper credence to the testimony of the treating doctors and to the answer to a hypothetical question of Dr. Bowman.

What happens in the case of Mrs. Hazen is now to the competent discretion of the Commission.