[L. A. No. 19609. In Bank. June 11, 1946.]

PACIFIC INDEMNITY COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION, HESTER P. HENSLICK et al., Respondents.

Herlihy & Herlihy for Petitioner.

Everett A. Corten, Edward A. Sarkisian and R. C. Mc-Kellips for Respondents.

EDMONDS, J. — The Industrial Accident Commission awarded a death benefit to the dependents of Charles A. Henslick, who died about thirty-six hours after a traffic accident which occurred as he was driving his automobile into a parking lot. By writ of review, the Pacific Indemnity Company, the insurance carrier of Consolidated Steel Corporation, Ltd., Henslick's employer, now challenges the commission's jurisdiction to make the award.

From the evidence presented to the commission, it appears that about 7:45 on a Saturday morning, as Henslick was entering a parking lot owned by the city of Long Beach but maintained by his employer, the vehicle which he was driving was struck by the automobile operated by William D. Johnson. The parking lot was adjacent to the Craig Shipyards, owned and operated by Henslick's employer. No one was permitted to park in the lot except Consolidated employees and this regulation was enforced by special guards employed by the company. The entrance used by Henslick was one of the means of access to the parking lot.

Two fellow employees were in Henslick's car at the time of the collision. One of them, William A. McClure, was riding in the back seat as the automobile entered the parking lot. He testified at the coroner's inquest that "the car hit our rear fender as we started into the parking lot. We were almost off the highway, that is, we were going across the highway going into the parking lot." According to his description of the accident, they had a "pretty good jolt," and he was thrown against the other side of the automobile.

William D. Johnson, the driver of the oncoming automobile and a fellow employee of Henslick, told the coroner's jury that the accident "occurred on the highway"; that it happened "around the yard, but not on the grounds." He described it as a minor accident, saying that the impact was not severe but a glancing blow; "we didn't hit very hard; it was just very easy on us," and the other vehicle "continued on" into the parking lot. The estimate which he made as to the speed of his car was about 25 to 30 miles per hour. He said that he was so nervous immediately after the accident that he could not write, and Henslick wrote his name and address for him. At that time Henslick did not indicate in any way that he was injured.

Charles S. Marston, who occupied the front seat with Henslick, testified before the referee of the commission that Henslick made a left turn in front of a line of considerable oncoming traffic in order to reach the parking lot. On the important issue as to the point of impact, Marston stated that "when the accident occurred, half of the car was on the gravel, and a Ford car parked there kept us from being tipped over; we hit and then straightened." In response to the question of whether they "had . . . gotten off the paved portion" of the public highway, Marston said: "Half and half. The front end was in the gravel and the rear end out in the pavement." He explained that the parking lot was graveled and began right on the street line; that is, "the street stops and the lot starts." As he related the occurrence, the Henslick automobile came to rest after the collision "with the front part of the car on the gravel, the rear end still on the pavement."

Later in the hearing Marston said that the cars collided "in the street." He characterized the impact as "pretty heavy" and the speed of the automobile driven by Johnson as between 45 and 50 miles per hour. When asked if there

was any formality in going through the gate into the parking lot, Marston replied: "If a person acts like a stranger and comes up from the other end—they have chains up there; we drove in from the rear and then use our 'id' cards and get admittance to get our time card."

The two vehicles collided with sufficient force to bend the fender of the Henslick car against the tire, and after the accident it was necessary for him and his passengers to lift the fender from the tire. Henslick's car, according to the testimony, was knocked against a parked automobile but bounced back again. The parked vehicle, according to Johnson, was "inside the lot" at the time of the impact. Marston testified that it was in "the entrance to the parking lot." After the accident the occupants of the Henslick vehicle drove about a block to park the car and then walked a distance of approximately two and one-half blocks to their stations.

Henslick, a plumber, worked as usual all of Saturday. McClure and Marston saw him two or three times during the day but he made no comment as to being ill nor did he show any sign of physical injury. During the trip home after work the accident was discussed but nothing was said about anyone being hurt. Mrs. Henslick rode home with her husband, and although she was informed of the accident, he made no complaint to her about any injury nor did he say that he was either bruised or shaken up.

That evening, Henslick and his wife drove to Santa Ana, a distance of about 30 miles for the round trip, where they made some purchases. Although they usually went to some place of entertainment each Saturday night, that evening Henslick said that "he didn't feel like going any place." The only walking he did on the trip was "just across the street" and then he said: "I just don't feel quite right." After Henslick returned home he told his wife that he "felt sort of weak; he didn't feel quite right." According to her testimony, before the accident, except for sinus trouble, her husband "was in good health at all times." But he did not sleep well that night, and when they arose the next morning he said that he "had not enjoyed his rest" and "was just tired."

Henslick did not feel like digging in the garden, but he put in some time on odd jobs and sprayed the inside of two small chicken sheds. Following luncheon, he lay down to rest and slept until about 4:30, an unusual thing for him to do. After the nap, he went to the chicken house to see if it was dry. A

few minutes later, in response to a call from a neighbor, Mrs. Henslick found her husband still on his feet leaning against the side of the chicken house. He fell forward into her arms and was dead when the doctor arrived about 45 minutes later.

The cause of death given by the autopsy surgeon at the inquest was: "heart tamponade, due to hemopericardium, as there was blood in the pericardian sac due to rupture of the aorta." He found no external bruises on the body except one on the clavicle, which he surmised was sustained at the time Henslick fell against the chicken house. The physician testified that, in his opinion, the ruptured aorta was the result of the jolt received in the automobile accident. Although a rupture of the aorta is usually followed by death quite soon thereafter, it was possible, he said, that death could result at a later time due to a slow seepage of blood. He explained that "in this particular case the rupture of the aorta was caused by some accidental means, some external injury, because the area of the aorta at that point where it was ruptured was normal." In his opinion, the jolt received in the collision was the only element in Henslick's history which could account for the death, and any strain during work as a plumber, or in straightening the fender, was not of the type of sudden tension which would be most likely to produce such a lesion.

At the hearing before the referee, the physician testified that, ordinarily, he would expect one whose aorta was ruptured to have shown distress of some kind, or some evidence of shock, such as cold sweat or pain in the chest, at the time of the injury. He admitted that it was possible that the lesion may have occurred at some later time, and that it might have been caused by some other accident. The physician was asked: "Then if we admit that there is no evidence of injury, if we eliminate guess work, is it not true that the cause of the lesion is unknown?" "Yes," was the reply. He agreed that a rupture of the aorta could happen spontaneously because of disease or weakened condition. It was also his opinion that persons "who suffer with a condition known as medical necrosis are subject to spontaneous rupture of the aorta," and to detect such a condition it would be necessary for a physician "to refer to microscopic study." No such examination was made in this case, he said. However, his final conclusion was that "the rupture of the aorta was the direct result of the jolt or shock which he [Henslick] got in the accident."

Before making a decision, the referee requested the assistant

medical director of the commission to state whether he had "correctly evaluated the medical probabilities that there was no causal connection" between the accident and the death. The response to this inquiry was: "I have reviewed the record —I find that you have correctly evaluated medical probabilities." The referee then reported to the commission that the injury was not compensable under the "going and coming" rule; that the "deceased did not sustain injury arising out of and occurring in the course of his employment"; and that "death [was] caused by the collision of the automobiles." In accordance with this report, the commission found that Henslick died "as the result of an automobile collision"; but that his death "was not caused or hastened by injury arising out of and occurring in the course of his employment." The referee, upon the ground of clerical error, later changed his report to read "that death of the employee . . . was not the result of an automobile collision."

The applicants' petition for rehearing was considered by Referee McCredie, who recommended that a rehearing be granted. Upon the basis of his report, the commission granted the petition and thereafter ordered Referee Campbell to formulate findings of fact and an award in favor of the applicant. At the time the order for rehearing was made by the commission, the transcript of the testimony taken at the hearing before Referee Campbell had not been filed.

In accordance with the commission's directive, Referee Campbell prepared findings and an award but included in them his dissenting views. He also noted that the order for the rehearing had been made before either the commissioners or Referee McCredie had read the transcript of the evidence.

The petitioner contends that there is no evidence to support the finding that the employee sustained injury arising out of and occurring in the course of his employment. Under the facts presented, it is clear that the accident falls within the purview of the "going and coming" rule. Furthermore, it is said, there is no evidence that the accident was industrial. The collision occurred on a public highway before working hours and the employee was a long distance from the place where he performed his duties. Upon the second decisive issue of the case there is no substantial evidence, the insurer declares, to support the finding that Henslick's death resulted from the automobile accident. The only medical opinion upon which that conclusion may be based rests upon erroneous

assumptions drawn from conjecture and surmise. The autopsy surgeon's conclusion was nothing more nor less than a series of guesses and speculations as to the cause of the ruptured aorta, and such evidence is insufficient.

In conclusion, the petitioner urges that the commission acted without and in excess of its powers in directing the formulation of the decision after rehearing contrary to the findings and recommendations of the trial referee and without itself resorting to the record; moreover, the decision rests upon the recommendations of a referee who did not hear the evidence nor read the transcript. The petitioner argues that, under sections 5313 and 5315 of the Labor Code, if the commission abides by the recommendations and report of the referee who heard the evidence, there is no requirement for it to review the transcript, but a contrary award may be made only after an independent examination of the record.

In support of the award, the respondents urge that Henslick's injury arose out of and occurred in the course of his employment. There is sufficient evidence to support the finding to that effect because the employee was going to his place of work upon premises controlled by his employer. It is also asserted that the injury received during the accident was the proximate cause of Henslick's death. They rely upon the testimony of the autopsy surgeon and argue that the cause of death is a question exclusively for experts.

Finally, the respondents defend the commission's procedure on rehearing, which they say was in accordance with the law and constituted due process. They point out that, at the time of granting a rehearing, the commission had before it the full transcript of the coroner's inquest, which included testimony concerning the circumstances at the time of the collision and also the opinion of the autopsy surgeon. The granting of a rehearing is not a final order, and the rules applicable to the reversal of an award are not pertinent. The award of compensation is justified by them upon the ground that, at the time of the decision on rehearing, the transcript of testimony presented to the trial referee was before the commission.

██ In compensation law the general rule is well established that injuries received by an employee while going to or coming from his place of work are not compensable. (*California Cas. Ind. Exch.* v. *Industrial Acc. Com.*, 21 Cal.2d 751, 754 [135 P.2d 158]; *Freire* v. *Matson Navigation Co.*, 19 Cal. 2d 8, 11 [118 P.2d 809]; *Smith* v. *Industrial Acc. Com.*, 18

Cal.2d 843, 846 [118 P.2d 6]; *Enterprise Foundry Co.* v. *Industrial Acc. Com.*, 206 Cal. 562, 565 [275 P. 432]; *California C. I. Exch.* v. *Industrial Acc. Com.*, 190 Cal. 433, 435 [213 P. 257].) However, in applying this general rule to border-line cases, the term "employment" has been held to include "not only the doing of the work, but a reasonable margin of time and space necessary to be used in passing to and from the place where the work is to be done." (*California Cas. Ind. Exch.* v. *Industrial Acc. Com.*, *supra*, p. 754; see, also, *Fireman's Fund etc. Co.* v. *Industrial Acc. Com.*, 61 Cal.App.2d 335, 338 [143 P.2d 104]; *Bethlehem Steel Co.* v. *Industrial Acc. Com.*, 70 Cal.App.2d 382, 388 [161 P.2d 59].) In further clarification of the general rule it has been held that injuries sustained by an employee while going to or from his place of work upon premises owned or controlled by his employer are generally deemed to have arisen out of and in the course of the employment. (*California Cas. Ind. Exch.* v. *Industrial Acc. Com.*, *supra*, p. 757; *Smith* v. *Industrial Acc. Com.*, *supra*, p. 847, and cases cited therein.) Also, it is well settled that if the employment creates a special risk, an employee is entitled to compensation for injuries sustained within the field of that risk. The employee may be subject to such a risk as soon as he enters the employer's premises, or the necessary means of access thereto, even when the latter is not under the employer's control or management. (*Freire* v. *Matson Navigation Co.*, *supra*, and cases cited therein.)

In the case of *California Cas. Ind. Exch.* v. *Industrial Acc. Com.*, *supra*, an employee was returning from a personal errand and caught her heel in the hem of her skirt as she was alighting from her own automobile which was parked in a driveway provided by the employer for the use of customers' and employees' vehicles. The driveway was but a few feet from the main entrance to the place of work and an award of compensation was affirmed. Because the injury was sustained upon the premises of the employer while the employee was going to work, this court held, the evidence supported the commission's finding that the injury arose out of and occurred in the course of the employment.

More closely in point is *Freire* v. *Matson Navigation Co.*, *supra*. A janitor had taken a taxicab to the pier where the ship upon which he worked was berthed. As he stepped from the cab he was struck by an auto driven by a fellow employee.

This court held that, because the employment created a special risk which the employee encountered as he was traveling by a necessary means of access to the employer's premises, he could not maintain an action for damages.

The most liberal application of this rule was made in *Smith* v. *Industrial Acc. Com., supra.* An employee at the Golden Gate International Exposition had "checked out" at the administration office and was proceeding homeward by way of the ferry terminal on a truck maintained by the employer but not provided for that purpose. The employee was riding upon the back of the truck without the driver's consent and, apparently, without his knowledge. The roads on the island, although used by the public, were under the control of the employer. On the way to the terminal, the employee jumped from the truck while it was in motion and sustained injury. Applying the rule that injuries sustained by an employee while going to or from his place of work upon premises owned or controlled by his employer are generally deemed to have arisen out of and occurred in the course of the employment, compensation was allowed.

In the present case the evidence shows a collision between the employee's automobile and another car while he was entering a parking lot adjacent to the place of work and maintained by the employer for the exclusive use of employees. The evidence shows that the Henslick vehicle was halfway into the lot when the impact occurred and was shoved against another automobile parked on the lot. Under such circumstances, it may reasonably be said that, at the time of the accident, the employee was on premises maintained by the employer.

Also there is evidence that the parking lot was a means of access to the place of work. It was necessary for an employee, approaching from the direction traveled by Henslick, to cross in front of a line of considerable oncoming traffic in order to reach the lot. According to the testimony, employees, after identification at the lot, parked their automobiles, obtained time cards and went on to their particular stations. The lot was adjacent to the shipyards, which evidently covered a considerable area, and was a part of its necessary activities. (See *Friere* v. *Matson Navigation Co., supra,* p. 12.)

█ Although the accident took place three and one-half blocks from Henslick's station, at the time when it occurred he was on the way to his place of duty on premises maintained

by the employer as a means of access to the plant. The fact that the accident happened some minutes before the employee was to begin work is immaterial. (*Freire* v. *Matson Navigation Co., supra,* p. 13.) As stated in *Cudahy Packing Co.* v. *Parramore,* 263 U.S. 418, 426 [44 S.Ct. 153, 68 L.Ed. 366] (quoted with approval in *Freire* v. *Matson Navigation Co., supra,* p. 13): "The employment contemplated . . . entry upon and departure from the premises as much as it contemplated . . . working there, and must include a reasonable interval of time for that purpose." What is a reasonable time depends upon the nature of the employment, the location and distances between different parts of the employer's premises, the difficulty of access thereto, and other significant factors.

Furthermore, the fact that an accident happens upon a public road and the danger is one to which the general public is likewise exposed, does not preclude the existence of a causal relationship between the accident and the employment if the danger is one to which the employee, by reason of and in connection with his employment, is subjected peculiarly or to an abnormal degree. (*Freire* v. *Matson Navigation Co., supra,* p. 12.) Also it is of no particular significance that the entrance used by the employee is not the exclusive means of access provided. (*California Cas. Ind. Exch.* v. *Industrial Acc. Com., supra,* p. 756.) Applying these rules, the automobile collision arose out of and while Henslick was acting in the course of his employment.

The cause of death, petitioner concedes, was a question for the determination of medical experts, but it contends that the opinion of the experts as to the cause of the ruptured aorta was based upon mere surmise and conjecture and not within the field of expert testimony. However, the opinion of a qualified medical witness with reference to the origin and cause of the injury or death is evidence which will support an award. (*Pacific Emp. Ins. Co.* v. *Industrial Acc. Com.,* 19 Cal.2d 622, 629 [122 P.2d 570, 141 A.L.R. 798].) The autopsy surgeon testified that, in his opinion, the rupture which caused Henslick's death was the result of the jolt received in the automobile accident. It was the only element in Henslick's history, he said, which would account for the death because of "this particular form of lesion of the aorta."

The physician's opinion was, in part, based upon the fact that the aorta was otherwise normal, the employee had been in good health, and he received a heavy jolt in the collision.

The record shows some symptoms of illness on the evening of the accident. Henslick did not feel well, he spent a restless night, he complained of being tired the next morning, and he did not work in the garden that day as he had planned to do. All reasonable inferences must be indulged to support the findings of the commission; reasonable probability, not absolute certainty, is all that is required. (*Pacific Emp. Ins. Co.* v. *Industrial Acc. Com., supra,* p. 629.) This evidence, therefore, is a sufficient basis for the determination of the commission upon the issue of the cause of the lesion. Each case must be considered upon its own particular facts, and the decisions relied upon by petitioner are distinguishable upon that ground.

Under section 5315 of the Labor Code, if the commissioners follow the recommendations of the referee who heard the evidence or read the record, they need not themselves review the evidence; however, if they make a contrary determination they are required to make an independent examination of the record. (*Bethlehem Steel Co.* v. *Industrial Acc. Com.,* 42 Cal.App.2d 192, 194 [108 P.2d 698]; *Taylor* v. *Industrial Acc. Com.,* 38 Cal.App.2d 75, 82 [100 P.2d 511].) But, this rule applies only to a final award by the commission and not to preliminary orders, such as the granting of a rehearing.

In the present case, it appears that the commission based its final decision on rehearing upon findings in favor of a death benefit prepared by Referee Campbell who, it is conceded, heard the evidence and read the transcript. If, as the petitioner contends, the commission disregarded the "true" findings of Referee Campbell, it had the authority to do so upon a consideration of the record. (Lab. Code, § 5315.) And as the return to the writ of review shows that the commission had before it the transcript of the evidence in the proceedings two days before it requested Referee Campbell to prepare findings and 18 days before the award upon rehearing was rendered, this court must presume that the decision was made after a consideration of the record. (*Pacific Emp. Ins. Co.* v. *Industrial Acc. Com., supra,* p. 633.)

The award is affirmed.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.