771 P.2d 524

**Fred M. PARKER, Claimant-appellant,**

v.

**Cha.`es ENGLE, d/b/a Mara Green Acres, Employer; Industrial Indemnity Company, Surety,**

**and**

**B & B Northwest Property Management; Ben and Joyce Benham, Defendants-respondents.**

No. 16836.

Supreme Court of Idaho.

March 27, 1989.

Fred Parker, Boise, pro se.

Quane, Smith, Howard & Hull, Boise, for respondents Engle and Indus. Indem. Alan K. Hull argued.

James C. Weaver, McCall, for defendants-respondents Benhams and B & B Northwest.

BAKES, Justice.

Claimant Parker appeals from a decision of the Industrial Commission which concluded that Parker had failed to sustain his burden of proving that his back injury arose out of and in the course of his employment with any of the named defendants. We affirm.

The relevant facts, as found by the Industrial Commission, are as follows. Charles Engle (Engle) engages in a number of real estate partnerships in several western states and Canada. Most of the partnerships are limited partnerships, with Engle acting as the general partner. Mara Green Acres (MGA) is one such partnership, acquired in the spring of 1985, and consisting of thirteen mobile home parks located in Garden City and Boise, Idaho. Engle had previously purchased two other mobile home properties in Boise. They are referred to as Shenandoah and Coach Royale and are owned by a separate partnership known as Mara Royale.

Ben and Joyce Benham (hereinafter "Ben" and "Joyce," respectively) had acted as property managers for Engle in Seattle. They also owned property in Idaho consisting of a guest lodge and cabins at Warm Lake, known as the North Shore Lodge. The Benhams sold the lodge earlier but reacquired ownership in 1984 when the purchaser failed to make required payments. In early 1985, the Benhams decided to return to Idaho to operate the lodge. Engle then asked the Benhams to manage the Mara Royale properties.

The Benhams initially planned to reside at Warm Lake while managing the Mara Royale properties on a part time basis. At that time a resident manager lived on the Mara Royale property and was responsible for day-to-day operations. However, when Engle acquired the Mara Green Acres properties in May, 1985, Joyce individually became the resident manager of MGA, thus requiring her daily presence on the properties. The Mara Royale resident manager resigned shortly thereafter and Ben took his place, necessitating Ben's daily presence at these properties, too. The Benhams took up residence in a mobile home located at the Shenandoah Park. On weekends the Benhams went to Warm Lake to supervise their own properties which, at that time, were being operated by Clayton and Rosemary Battles.

Claimant Fred Parker (Parker) and his wife Brenda had previously worked in property management for the Benhams in Seattle, and later separately for Engle in Portland. In July, 1985, the Parkers expressed an interest in coming to Idaho to work for the Benhams again. This was discussed among the Parkers, the Benhams, and the Engles. The Parkers arrived in Boise on approximately July 23, 1985, and agreed to work at MGA under Joyce's supervision. They were to be paid $550 apiece per month. Brenda was to work in the office, and Fred was to work as a maintenance person, performing general maintenance around the MGA properties. At the hearing below, the referee found that claimant was an employee of MGA and that his employment was subject to the provisions of the Idaho Workmen's Compensation Law.

On Thursday, September 26, 1985, Joyce informed Parker that his services would no longer be required but that he should complete the projects on which he was currently working and then his employment would cease. Parker needed to work off some outstanding cash advances. Joyce took this action because claimant was a distracting influence on other employees. He was causing problems which she wished to alleviate. Further, her testimony before the Industrial Commission reveals that claimant's termination was a direct order from Engle.

On Friday, September 27, 1985, claimant Parker and his wife made a late evening trip to the North Shore Lodge. Ben was alone at the lodge because the Battles had been called away on an emergency. Joyce remained in Boise until the following day. The Parkers went in an attempt to persuade Ben to intercede with Joyce so that

Parker could remain employed with MGA. The Parkers were unsucces ful in persuading Ben to intercede. He considered the arrangement to be entirely the responsibility of Joyce since she was managing MGA.

Nevertheless, the Parkers remained at the lodge for the weekend and during their stay claimant and Ben had a conversation concerning a large commercial water heater located in an abandoned wash house at one of the MGA trailer parks. Ben mentioned that he would like to have the water heater checked, and if it was usable he would utilize it at his North Shore Lodge. Ben suggested that Parker check the water heater if he had time.

Before the weekend was over the Benhams decided to close the North Shore Lodge because the caretaker had not returned and the season was coming to an end. It was decided to return to the lodge the following weekend, October 5 and 6, to close the lodge for the winter. The Parkers volunteered to assist, and the Benhams subsequently invited them to return.

During the first week of October, claimant worked 26 hours for Mara Green Acres and was later compensated for that time at an hourly rate. (Previous to the notice of termination on September 26, 1985, he was paid a flat monthly salary and worked a 40–45 hour week.) On Friday, October 4, claimant and an MGA employee went to the aforementioned wash house and removed the water heater that was the subject of the earlier Parker/Ben conversation. The water heater was taken to the rear of the MGA office and claimant filled it with water to check for leaks. He found it did not leak, then drained the water. Later that afternoon, claimant backed the Benhams' pickup up to the water heater, tilted the heater into the pickup bed, and then shoved the heater to the front of the truck. While shoving the heater forward, he felt a sudden pain in his low back. It is this incident which forms the basis of Parker's claim for worker's compensation benefits.

The Parkers departed Boise late that Friday afternoon and drove the Benhams' pickup and the water heater to the North Shore Lodge. Earlier in the week the Parkers had obtained the Benhams' permission to drive the Benhams' pickup because the Parkers' car was in need of repair. Both couples spent the weekend at the lodge. Claimant assisted the Benhams in tasks associated with closing the lodge, including unloading the water heater and placing it in a storage shed. Ben was surprised to see the heater. He did not believe it had been properly tested (due to its nature, a professional, high pressure test would probably be required), nor was it yet suitable for use at the lodge—it needed to be converted to propane gas.[1] Nevertheless, he did not discuss it with the claimant as he believed Parker was merely trying to be helpful.

Claimant and his wife returned to Boise on Monday, October 7th. He consulted a physician the following day and underwent back surgery approximately a week later.

Parker filed a claim for worker's compensation benefits. After an extended hearing, an Industrial Commission referee found that Parker suffered a back injury while loading the water heater into the Benhams' pickup on October 4, 1985. However, the referee also found that claimant's activities with the water heater were not related to any employment with Mara Green Acres or with the Benhams. The referee reasoned that Parker had been terminated on September 26th, and the water heater had nothing to do with the projects Joyce had instructed him to finish. Rather, claimant was acting on Ben's statement that he would like the water heater checked to see if it was suitable for use. The lodge had no connection with MGA or with the Benhams' management of Engle's property interests. The referee further

1.  Ben Benham testified:

Q. [By Mr. Sheils] What type of—would you have checked this water heater out before moving it out and so forth to see if it was operational?

A. My original plans were to take it to the gas company and have them put a high-pressure water to it and convert it to propane gas. It will have to be transported back to Boise and all this stuff done. It's no use to me at the lodge at this time.

found that claimant's activities with the water heater were not in the course of his MGA employment, and his back injury did not arise out of that employment. Instead, claimant's efforts were purely a voluntary activity to assist the Benhams in connection with the North Shore Lodge. These factors led the referee to ultimately conclude that "[t]he Claimant has failed to sustain his burden of proving that the injury of October 4, 1985, arose out of and in the course of employment with any of the Defendants named." The Commission adopted the referee's findings and conclusions; accordingly, Parker's claim was denied. Parker appeals.

As all the parties recognize in their briefs, the issue on appeal is whether the commission's findings are supported by substantial, competent evidence. Since they are, we must affirm.

■ Appellate review of findings of fact made by the Industrial Commission is limited in scope. Idaho Const. art. 5, § 9. This review does not entail a de novo determination of the facts. We are not concerned with whether this Court would have reached a different conclusion if we were the finders of fact, *Parker v. St. Maries Plywood*, 101 Idaho 415, 614 P.2d 955 (1980), but rather with whether the Commission's findings are supported by substantial, competent evidence. This Court can reverse the Commission's findings only when they are not supported by "any substantial competent evidence." I.C. § 72–732(1); *Lopez v. Amalgamated Sugar Co.*, 107 Idaho 590, 691 P.2d 1205 (1984); *Nelson v. Pumnea*, 106 Idaho 48, 675 P.2d 27 (1983); *Green v. Columbia Foods, Inc.*, 104 Idaho 204, 657 P.2d 1072 (1983); *Case of Graham*, 103 Idaho 824, 654 P.2d 1377 (1982).

■ A basic tenet of appellate review is that on appeal the evidence in the record is to be construed most favorably to the party which prevailed below. *Hazen v. General Store*, 111 Idaho 972, 729 P.2d 1035 (1986); *Higginson v. Westergard*, 100 Idaho 687, 604 P.2d 51 (1979). Viewing the evidence most favorably to the respondent, the record supports the Commission's decision that Parker failed to sustain his burden of proving that his injury arose out of and in the course of employment with any of the named defendants. Although the evidence is conflicting, this Court continues to recognize the Industrial Commission as the arbiter and evaluator of the weight to be given the evidence, *Nelson v. Pumnea*, 106 Idaho at 50, 675 P.2d at 29; *In re Chavez*, 104 Idaho 279, 658 P.2d 950 (1983), and the credibility of witnesses. *Wolf v. Kaufman & Broad Home Systems, Inc.*, 106 Idaho 838, 683 P.2d 874 (1984).

The Commission made two findings integral to this appeal. First, it found that Parker had already been terminated at the time of the alleged injury. The record contains substantial, competent evidence to support this finding. Joyce Benham testified that on September 26, 1985, she terminated Parker. He was to finish only those projects currently in progress. The next day Parker attempted to change Joyce's mind, but his efforts were in vain.

That Parker was terminated in late September is further evidenced by Ben Benham's testimony. He testified that on the morning of September 28th, "Fred tried to ask me why Joyce was letting him go, would I intervene, and I said, Fred, I do not run Mara Green Acres. You have to take all that stuff up with Joyce." Ben further testified:

Q. [By Mr. Sheils] What was your understanding of the employment relationship of Mr. Parker that Sunday, September 28th, 1985, when he got in his car and left [the North Shore Lodge]? Did he have any employment with either Mara Green Acres, Mara Royale or anybody?

A. Nothing.

Q. Are you sure of that?

A. He was not employed.

Q. How do you know that?

A. My wife had told me by that time, and the only thing that I understood that he was supposed to catch up on some money that he had already advanced, finish some jobs, and that was the end of it.

The Benhams' testimony is further corroborated by claimant's own Exhibit No. 10, a payroll record and tax statement. Claimant's other payroll record and tax statements, offered as exhibits, show he earned a flat salary; they are devoid of any daily "hours worked" entries. Claimant's Exhibit No. 10, conversely, shows no salary; rather, it shows an hourly rate and "hours worked" entries for Tuesday, Wednesday, Thursday and Friday of the first week of October, 1985. Five hours were reported for Friday, October 4th.

The second finding integral to the Commission's conclusion that Parker failed to sustain his burden of proof was that Parker's actions regarding the water heater were voluntary. (Voluntary activities will not suffice; an award of compensation depends on the existence of an employer/employee relationship. *In re Sines*, 82 Idaho 527, 356 P.2d 226 (1960).) His efforts were purely a voluntary activity to assist the Benhams in connection with the North Shore Lodge. Parker has implied that his actions regarding the water heater were taken in order to complete one of the outstanding projects referred to by Joyce during her termination conversation with him. This, however, cannot be so. The uncontroverted evidence shows that Parker first learned of Ben's desire to test the water heater during the weekend of September 28–29, 1985. This was after the termination conversation, which occurred on September 26th and 27th. Hence, the testing and transportation of the water heater was not one of the outstanding projects referred to by Joyce when she terminated Parker.

That Parker's actions regarding the water heater were voluntary is further corroborated by testimony in the record. Ben Benham testified:

Q. [By Mr. Sheils] Did you ever tell Mr. Parker to move this particular water heater up to the lodge?

A. No, I did not.

Q. Did you ever instruct him to move it from the wash room in Del Ann?

A. No, I did not.

Q. Are you sure of that?

A. I just said, Don't destroy it.

Q. Why did you tell Mr. Parker not to destroy it?

A. Well, Fred has a funny way of doing things on his own, and I just felt that it was a good safety device.

Ben's testimony on cross examination was similar:

Q. [By Mr. Hull] Did you ever tell him to take this water tank to the lodge?

A. No.

Q. Did you ever tell him to take it out of that shed?

A. No, I did not.

Q. Did you ever tell him to do anything with the shed?

A. No. I just told him, don't destroy the water heater, that I would very possibly have a use for it.

Q. That happened on the weekend of the 27th?

A. Yes. . . . .

Joyce's testimony on cross examination is in accord:

Q. [By Mr. Hull] I'm showing you what's been marked and admitted as Exhibit 42, which is [a picture of] the hot water heater at the Lodge. Did you have a contract with Mr. Parker to remove that hot water heater from the shed in Del Ann and to haul it to the Lodge?

A. No, I did not.

Thus, the Commission's finding that Parker's activities regarding the water heater were purely voluntary is supported by substantial, competent evidence in the record.

The record also demonstrates that the Parkers' return to the lodge the next weekend, October 5th and 6th, was voluntary. As Joyce Benham testified:

Q. [By Mr. Sheils] Was there any discussion of coming back or returning the next week to the lodge?

A. Um-hmm. Towards the—Sunday morning sometime, Joanne and Brian [Joyce's son and daughter-in-law], I think, arrived and—

Q. Wait a minute. They arrived at the Lodge?

A. Um-hmm. And I was trying to talk them into coming back up. But it was rent time and so I knew it wouldn't be possible. And Fred and Brenda both said they would like to do it. So I asked Ben if that's okay with him, and he said he didn't care.

Q. What do you mean they would like to do it?

A. They would like to help us close up.

Q. All right. Did you offer them any wages?

A. Oh, no.

Ben further testified:

Q. [By Mr. Sheils] Was there any conversation had by Mr. Parker as far as offering to come up or help you close the Lodge up that weekend or the following weekend?

A. To tell you the truth, I don't know how they got involved in coming up the following weekend. We may have said, Come up. I don't know. It might have been one of those apology-type situations.

The Commission found that not only were Parker's actions regarding the water heater voluntary, but so was his October 5–6 trip to the North Shore Lodge. The Commission's findings on these issues are also supported by substantial, competent evidence.

Our review is necessarily limited. There is substantial, competent evidence in the record to support the Commission's findings that Parker had indeed been terminated prior to his injury and that his actions regarding the water heater were strictly voluntary. Therefore, the Commission's conclusion that claimant failed to prove that his injury arose out of and in the course of his employment, I.C. § 72–102(14)(a), is supported by the record, and we affirm the decision of the Industrial Commission.

Costs to respondent. No attorney fees.

SHEPARD, C.J., and JOHNSON, J., concur.

HUNTLEY, Justice, dissenting.

I respectfully dissent, believing the majority reaches its result only by ignoring certain undisputed facts and certain case precedents of this Court.

We start with the fact that this injury occurred on the employer's premises, which raises a presumption the injury was work-related under the rule of *Foust v. Birds Eye Division of General Foods Corp.*, 91 Idaho 418 at 419, 422 P.2d 616 at 617:

A contrary presumption, that is, that the injury arises out of and in the course of employment, prevails where the injury occurs on the employer's premises, as in the instant case and *Nichols v. Godfrey*, supra [90 Idaho 345, 411 P.2d 763 (1966)]. *Skeen v. Sunshine Mining Co.*, 60 Idaho 741, 96 P.2d 497 (1939); *Dutson v. Idaho Power Co.*, 57 Idaho 386, 65 P.2d 720 (1937); *Burchett v. Anaconda Copper Min. Co.*, 48 Idaho 524, 283 P. 515 (1929); *Pacific Indemnity Co. v. Industrial Acc. Com.*, 28 Cal.2d 329, 170 P.2d 18 (1946).

The record establishes that Ben Benham asked Parker to check out the water heater for his possible use at Warm Lake. Although Joyce Benham directly managed Mara Green Acres for one Charles Engle, who owned the business, her husband, Ben, worked in the business in a management capacity with ostensible authority over Parker. For example, Ben at times signed Parker's payroll checks, checked the accuracy of MGA payroll records, and even used the B & B Northwest checking account (his Warm Lake business) as a conduit for some of the money utilized in the operation of Mara Green Acres.

The Commission noted that "the fact that some of the pay checks for claimant and his wife were written on the B & B Northwest checking account is not sufficient to make the claimant an employee of that corporation." In so commenting, the Commission misconstrued the import of that evidence which was that Ben had ostensible authority to direct Parker's activities for Mara Green Acres.

The water heater was owned by MGA and Joyce Benham's son helped move it, all

of which indicates the transaction was between the two business entities for the benefit of both.

Even more telling, and ignored by the Commission and the majority, is that until the claim became serious the Benhams acknowledged coverage (even visited claimant in the hospital and told him he had coverage) and then when they decided to deny coverage, it was not on the basis of Parker's having been working for the wrong employer, but rather on the basis he had earlier been fired. When the payroll records gave the lie to that defense, the ground of the defense was shifted to that now being accepted by the majority.

It is true the water tank was to be for B & B's use and not MGA's—but to so focus completely misses the point. The record is undisputed in that the two companies frequently cooperated with each other for their mutual benefit in the exchange and joint use of funds, cross services of management, and shared use of vehicles and equipment.

Unless it can be said that the water tank was being stolen from MGA (while being loaded by Parker and Mrs. Benham's son and transported in an MGA truck), what we likely had here was an instance of more cooperation and exchange between the enterprise managed by Mrs. Benham and that managed by Mr. Benham. A further note is that when the MGA truck arrived at Warm Lake, both Mr. and Mrs. Benham were present. Significantly, they did not repudiate the transaction by leaving the water heater in the truck and sending it back to Boise—instead, Mr. Benham assisted in the unloading of the water heater into a shed at Warm Lake.

In summary, the Commission never focused on the issue of whether the water heater transaction (albeit for use at Warm Lake) was in the course and scope of MGA's business in the sense of furtherance of the quid pro quo which frequently transpired between the businesses.

Accordingly, I would reverse and remand for findings and conclusions on that issue.

BISTLINE, J., concurs.

BISTLINE, Justice, dissenting.

This case directly calls into question the role of the Court in determining appeals from the Industrial Commission. On the one hand, we should not set aside factual determinations when they are supported by the record. On the other, when we see that the law is ignored or that the evidence does not support the findings, or the findings do not support the conclusions, the Court ought not simply rubber stamp the Commission's decision, thereby abdicating the obligations imposed upon us as temporary tenants of this high office. In the case now before us, it is manifest that the proposed opinion is not in conformity with that obligation.

Where, as here, the injury occurs on the employer's premises, it is *presumed* that the injury arises out of and in the course of employment. *Foust v. Birds Eye Division of General Foods Corp.*, 91 Idaho 418, 419, 422 P.2d 616, 617 (1976) (citing *Skeen v. Sunshine Mining Co.*, 60 Idaho 741, 96 P.2d 497 (1939); *Dutson v. Idaho Power Co.*, 57 Idaho 386, 65 P.2d 720 (1937); *Burchett v. Anaconda Copper Min. Co.*, 48 Idaho 524, 283 P. 515 (1929); *Pacific Indemnity Co. v. Industrial Acc. Com.*, 28 Cal.2d 329, 170 P.2d 18 (1946)). This presumption, established back in the "barbaric" days of the Progressive Era in *Burchett,* and steadfastly applied thereafter, has been consciously omitted by the majority in these kinder, gentler days of the late 1980's. Either the majority feels the point is too trivial to warrant discussion or it cannot fathom a way to explain its omission. As a result, the employer's premises rule has been overruled, not by discussing any shortcomings of the rule, but by its selective non-application. While it could be said that the rule remains extant, and has simply been ignored, this is not acceptable unless it is accepted as a given that this Court is at liberty to at will ignore well-established case precedent.

Parker's injury occurred while he was moving a hot water heater, not his and not one in which he had any proprietary interest or any personal interest, located on

Mara Green Acres, property owned by his employer, Charles Engle. Thus, under our long line of cases cited above, the injury is presumptively compensable. The Commission errs, therefore, in concluding that Parker "failed to sustain his burden of proof that the injury of October 4, 1985, arose out of an in the course of employment" with Mara Green Acres (MGA). Parker carried his burden AS A MATTER OF LAW.

The provisions of the Worker's Compensation Law are to be liberally construed in *favor* of the employee. *Jones v. Morrison–Knudsen Co.*, 98 Idaho 458, 567 P.2d 3 (1977); *Burch v. Potlatch Forests, Inc.*, 82 Idaho 323, 353 P.2d 1076 (1960). Liberal construction in favor of the worker is required to enable the act to serve the humane purposes for which it was promulgated, "leaving no room for narrow, technical construction." *Hattenburg v. Blanks*, 98 Idaho 485, 485, 567 P.2d 829, 829 (1977).

Few decisions from this Court have defined the circumstances under which an individual will be relegated to the status of a volunteer and by reason thereof ineligible for worker's compensation. In *Eriksen v. Nez Perce County*, 72 Idaho 1, 235 P.2d 736 (1951), the Court reversed the award of compensation benefits where the claimant's injury to his head and shoulder arose from the performance of acts for his own personal benefit. It was there held:

Injuries received by an employee while voluntarily engaging in some activity, undertaken *solely for his own benefit*, do not ordinarily arise out of or in the course of his employment especially where such activity is not an incident of his employment, nor has any connection or relation to such employment.

72 Idaho at 8, 235 P.2d 736 (emphasis added). Similarly, this approach is followed in Utah. In *Board of Education v. Olsen*, 684 P.2d 49 (Utah 1984), a carpenter who volunteered to teach a community-sponsored class was injured in a woodshop during the lunch hours. The court reversed the award of benefits for the claimant. One of the dispositive facts upon which the court relied was that at the time of the injury, the claimant was working on a personal project. 684 P.2d at 50. Unlike *Eriksen* and *Olsen*, the record in the instant case is *void* of evidence indicating that Parker moved the water heater for personal gain. At that time he was in fact still receiving compensation earned as a maintenance worker for MGA.

Respondent Engle, doing business as MGA, argues that because Parker was not specifically instructed to move the water heater and because moving it did not further the business interests of MGA, the injury could not be said to arise out of an in the course of his employment with MGA, hence making him ineligible for compensation benefits. This argument is unconvincing.

The "outside regular duties" doctrine should be applied here. Professor Larson, in the leading treatise on worker's compensation law, summarizes the doctrine:

An act outside an employee's regular duties which is undertaken in good faith *to advance the employer's interests*, whether or not the employee's own assigned work is thereby furthered, is within the course of employment.

1 A. Larson, *Workmen's Compensation Law*, § 27 (1985) (emphasis added). Workers are often complimented, and promoted, on their willingness and ability to accomplish additional tasks pending direct instructions from their employer, having received a strong indication as to some task or objective which the employer desires to have accomplished. As Larson notes, the rationale behind the rule is simple: it would be contrary to *employer's* interests to preclude workers from performing additional duties on pain of losing compensation benefits for any injuries thereby sustained:

This being the broad reason for the rule, the employee who honestly attempts to serve his employer's interest by some act outside his fixed duties should not be held to the exercise of infallible judgment on what best serves those interests.

Larson, *id.*, at § 27.12 (footnote omitted). The technical, narrow application of a contrary rule such as we see today in the majority's disposition would contravene the

humane purposes which worker's compensation laws were designed to further. As noted above, this Court, any court guided by principles of fairness and justice, eschew such doctrines in favor of a liberal construction, whereunder any cases deemed doubtful are resolved for the claimant. *Kiger v. Idaho Corp.*, 85 Idaho 424, 380 P.2d 208 (1963).

The record makes clear that Ben Benham's directive to Fred Parker to check the water heater, if Parker had time, involved Parker's employment with MGA. The uncontradicted evidence shows the following. According to the testimony of Engle, Ben Benham was hired to supervise the "overall Boise operation." R. at 115. In this capacity, Ben Benham has the "total" authority to hire and fire employees, and set the terms of their employment with MGA. *Id.* Ben Benham, at times, signed Fred Parker's payroll checks for services rendered to MGA. Claimant's Exhibit 4. Also, Ben Benham checked the accuracy of the MGA payroll records. R. at 812. Ben Benham was familiar with the water heater and the washroom on MGA property where it was located. R. at 611–12. He considered the washroom a fire hazard and planned to tear it down. R. at 612. When Ben Benham asked Parker to determine whether the water heater functioned, he also stated, and the Commission specifically found, that Benham planned to utilize the water heater at the North Shore Lodge if it worked. R. at 23. The cited testimony, uncontradicted, must be accepted as true. *Pierstorff v. Gray's Auto Shop*, 58 Idaho 438, 447, 74 P.2d 171, 175 (1937). Although Ben Benham did not specifically direct Parker to move the water heater, and only to "check it out if he had time," Ben Benham testified, and *the Commission found*, that in his efforts with the water heater *Parker was "trying to be helpful."* R. at 25.

As a matter of law, Parker's movement of the water heater, and the back injury resulting therefrom, arose out of and in the course of his employment at MGA. The injury occurred on MGA property while Parker was on the MGA payroll. Presumptively, therefore, the injury is compensable, *Foust*, 91 Idaho at 419, 422 P.2d at 617, and Parker met his burden. The Commission erred, consequently, in concluding that Parker "failed to sustain his burden of proof that the injury of October 4, 1985, arose out of and in the course of employment" with MGA. R. at 27. And if more were needed, at the time of the injury, Parker was using a truck provided by MGA for his maintenance duties. R. at 30, 380 and 615. Under the outside regular duties doctrine, an injury outside an employee's regular duties which is undertaken in good faith to advance the employer's interest, whether or not the employee's own assigned work is thereby furthered, is within the course of employment. In this case Parker was not ordered to move the water heater; he was, however, requested by the supervisor of Engle's Boise property to "check it out." It has been said that an employer's wish is the employee's command. Most employees will ordinarily realize that there is much to be gained by adhering to that time-honored adage. Contrary to the assertions of respondent Engle, Parker's efforts with the water heater as a condition precedent to compensation eligibility, need not have been in furtherance of MGA's business interests. Rather, under the doctrine, so long as the worker in good faith undertakes the task with the purpose of advancing the employer's interest, the injury is compensable. The record is barren of evidence establishing that Parker's movement of the water heater was somehow done in bad faith, the Commission put that inquiry at an end by finding just the opposite, *i.e.*, that Parker *"was trying to be helpful."*

Accordingly, this case should be reversed and remanded to the Commission with direction to compute the compensation due Fred Parker. The majority does otherwise, however, only by running roughshod over settled case law and the record. That is a known. What remains an unknown is: Why this trampling under of the legislative mandate that "Idaho's workmen's compensation statutes are designed to provide sure and certain relief for injured workmen and their families...." I.C. § 7–201. *This Court has consistently held that the legis-*

*lative policy requires our statute be construed "liberally in favor of the claimant. Miller v. Amalgamated Sugar Co.,* 105 Idaho 725, 672 P.2d 1055 (1985)." *Horton v. Garrett Freightlines, Inc.,* 106 Idaho 895, 684 P.2d 297 (1984). It has been said on many occasions that, "Consistency is the virtue of small minds." Accepting that as the truism for which it has been offered, the majority today achieves much virtue in reaching a decision wholly at odds with prior Idaho precedent cited herein, at odds with the *Larson* treatise cited herein, and at odds with the Court's heretofore philosophy of approaching worker's compensation cases with the above-mentioned legislative policy well in mind.

HUNTLEY, J., concurs.